SEITZ, Justice,
for the Majority:
Philip Shawe and his mother, Shirley Shawe, have filed an interlocutory appeal from the Court of Chancery’s August 13, 2015 opinion and July 18, 2016 order, and related orders, appointing a custodian under 8 Del. C. § 226 to sell TransPerfect Global, Inc., a Delaware corporation. After a six-day trial filled with unprecedented evidence of a lengthy and seriously dysfunctional relationship between the owners, culminating in Philip Shawe’s litigation misconduct, the Court of Chancery issued a 104-page opinion concluding that the warring factions were hopelessly deadlocked as stockholders and directors. The court carefully considered three alternatives to address the dysfunction and deadlock, and in the end decided that the circumstances of the case required the appointment of a custodian to sell the company.
*155 On appeal, the Shawes do not challenge the Court of Chancery’s many factual findings of serious dysfunction and deadlock. Instead, Philip Shawe claims for the first time on appeal that the court exceeded its statutory authority when it ordered the custodian to sell a solvent company. Alternatively, Shawe contends that less drastic measures were available to address the deadlock. Shirley Shawe has taken a different tack, and argues for the first time on appeal that the custodian’s sale of the company might result in an unconstitutional taking of her one share of TransPerfect Global stock.
We disagree with the Shawes and affirm the Court of Chancery’s judgment. First, under the custodian statute, the Court of Chancery may appoint a custodian when the stockholders are unable to elect directors whose terms have expired. Here, the parties stipulated that they were unable to do so. Further, a custodian may be appointed when the corporation’s business is suffering from, or is threatened with, irreparable injury because of divisions between the directors, and the stockholders are unable to terminate the division. Here, the director and stockholder deadlock are undisputed, and the Court of Chancery made detailed factual findings of threatened and actual irreparable harm to the company which we will not disturb on appeal. We also agree with the Court of Chancery’s conclusion that, in circumstances such as this, when intermediate measures were attempted but failed, the Court of Chancery properly exercised its discretion to sell the company and distribute the proceeds to deadlocked stockholders. ■
Finally, Philip and Shirley Shawe have attempted' to raise statutory and constitutional arguments that were not considered by the Court of Chancery. Under this Court’s long-standing rules and the important policy reasons guiding them, we do not consider arguments raised by the Shawes for the first time on appeal. Our dissenting colleague has concluded, however, that even though the statutory argument was never considered by the Court of Chancery, it should be addressed for the first time on appeal. Thus, in response to the dissent, we explain why we disagree with its interpretation of the custodian statute.
I.
TransPerfect Global, Inc. (“TPG”) is a Delaware corporation that acts as a holding company for the main operating company, TransPerfect Translations International, Inc. (“TPI”), a New York corporation, Both entities will be referred to as the “Company.” The Company provides translation, website localization, and litigation support services from 92 offices in 86 worldwide cities. It has over 3,500 full-time employees and maintains a network of over 10,000 translators, editors, and proofreaders in about 170 different languages. Elting and Shawe co-founded the Company, and are co-chief executive officers and board members.
TPG has 100 shares of common stock issued and outstanding, divided fifty shares to Elting, forty-nine shares to Shawe, and one share to Shirley Shawe. In this Opinion, we refer to Philip Shawe as “Shawe,” and Shirley Shawe by her full name. The one share allocated to Shirley Shawe allowed TPG to claim the benefits of being a majority women-owned business. We credit the Court of Chancery’s finding, based on evidence introduced at trial, that Shawe “has treated his mother’s share as his own property and himself as a *156 50% co-owner of the Company.”[1] After a corporate reorganization in 2007, TPG’s bylaws provided for a three member board of directors, or a different number fixed by the stockholders. Elting and Shawe have been the only directors since the Company’s reorganization in 2007.
To fully appreciate the personal nature of the long-running discord leading to the Court of Chancery’s ruling, we go back to the Company’s founding and the troubled romantic relationship between the founders. Elting and Shawe co-founded the business in 1992 while living together in a dormitory room attending New York University’s business school. They were engaged in 1996, but Elting called the marriage off in 1997. As the Court of Chancery found, “Shawe did not take the break-up well, and would ‘terrorize’ her and say ‘horrendous things’ about her husband, Michael Burlant, whom she married in 1999,”[2] On two separate occasions, Shawe responded to the rejection by crawling under Elting’s bed and refusing to leave.[3]
As the Company grew, the founders were not satisfied with their financial success, and brought their simmering personal discontent into the Company’s business affairs. The Court of Chancery catalogued the serious clashes over the years between Shawe and Elting and their surrogates before, and remarkably, during the litigation:
• Shawe engaged in a secret campaign to spy on Elting and invade her privacy by intercepting her mail, monitoring her phone calls, accessing her emails (including thousands of privileged communications with her counsel), and entering her locked office without permission on numerous occasions as well as sending his so-called “paralegal” there at 4:47 a.m. on another occasion.
• Shawe co-opted the services of Company advisors (e.g., Gerber and Kasowitz) to assist him in advancing his personal agenda against Elting.
• Shawe unilaterally hired numerous employees to .perform Shared Services functions (Accounting and Finance) and even to work in divisions Elting managed (Chris Patten in TRI) without her knowledge or consent by creating “off book” arrangements and fabricating documents.
• Shawe sought to have Elting criminally prosecuted by referring to her as his ex-fíancée seventeen years after the fact when filing a “Domestic Incident Report” as a result of a seemingly minor altercation in her office.
• Shawe disparaged Elting and tried to marginalize her within the Company by gratuitously disseminating a memorandum (on Gerber’s letterhead) to employees in her own division accusing her of collusion and financial improprieties.
• Shawe disparaged Elting publicly by unilaterally issuing a press release in the Company’s name containing false *157 and misleading statements.[4]
These were just some of the highlights of the facts found by the Court of Chancery after a lengthy trial. The court also made detailed findings about continuous acrimonious disputes over personal and business expenses, weekly if not daily temper tantrums, and “mutual hostaging” between the founders over proposed acquisitions, stockholder distributions, employee hiring, pay and bonuses, and office locations. The court also found that Shawe bullied Elting and those aligned with her, expressing his desire to “create constant pain” for Elting until she agreed with Shawe’s plans.[5] It was common for senior officers to be drawn into their disputes, who were then abused by threatened firings, substantial fines, inappropriate emails, and by withholding compensation and promotions.
Specific to the Company’s operations, the Court of Chancery heard days of testimony leading to findings that:
• Elting refused to pay litigation counsel to defend significant ongoing patent infringement litigation.
• Shawe fired real estate professionals, public relations professionals, refused to execute leases, and interfered with the Company’s payroll processes.
• Shawe refused to engage in an annual expense true up, and interfered with the annual review of the Company’s finan-cials and its audit process.
• Shawe falsified corporate records to avoid review by Elting.
The Court of Chancery best captured the lengths that Shawe would go to harass Elting in- its recounting of Elting’s plane trip to Paris in 2014:
On December 2, 2014, Elting boarded a red eye flight to Paris and discovered, to her surprise, that Shawe was seated across the aisle from her. Shawe claimed to have “no idea” she -would be oh the flight. In truth, Shawe previously learned that Elting would be on the flight and made arrangements to be seated next to her without her knowledge. Elting changed seats. The next day, Shawe sent a text message to several of his allies, stating: “Was next to Liz on the plane to Paris and she switched seats;).” Two of the recipients of the text message were Nathan Richards and Joe Campbell, both of whom are implicated in events concerning Shawe’s alleged spoliation of evidence, which, is the subject of a motion for sanctions discussed below.
I find Shawe’s characterization of the incident as an attempt to extend an olive branch not to be credible. He did not deny telling Elting that he had “no idea” she would be on the flight, which was not true, and the smiley-face emoticon at the end of his text message suggests he was amused by yet another opportunity to harass Elting, who Shawe knew full well would not welcome his presence on the flight.[6]
II.
While Shawe and Elting continued to harass each other, interfere with the business, and demoralize the employees, they filed four lawsuits against each other.[7] The *158 conflict eventually distilled down to Elt-ing’s petition under 8 Del. C. § 226 to declare a deadlock and appoint a custodian to sell TPG.
The court dedicated enormous resources to the dispute. It held twelve hearings, decided sixteen motions, and conducted a six-day trial. Before its final decision, the Court of Chancery took the measured step of appointing a custodian to serve as a mediator to assist Shawe and Elting to try and settle their disputes. The court also delayed its post-trial decision for two months to await the parties’ ongoing efforts to resolve the controversy. After the many attempts at settlement failed, the Court of Chancery issued its 104-page decision finding that “the evidence presented at trial warrants the appointment of a custodian to sell the Company to resolve the deadlocks between Shawe and Elt-ing.” [8]
First, the Court of Chancery found that Elting had satisfied the requirements of § 226(a)(1) to appoint a custodian for stockholder deadlock because the parties stipulated that they were divided and unable to elect successor directors. Next, the court held that Elting satisfied the three requirements of § 226(a)(2) for appointment of a custodian due to director deadlock. As to the first requirement, the existence of deadlocks, the court reviewed in painstaking detail its many factual findings, now undisputed on appeal, supporting its conclusion that the distrust Shawe and Elting have for each other “strikes at the heart of the palpable dysfunction that exists in the governance of the Company.”[9] The Court of Chancery also held that the second requirement, the stockholders’ inability to break the director deadlock, was satisfied by the parties’ stipulation of deadlock.
Turning to the final requirement, harm to the business, the Court of Chancery considered the profitability of the Company, but also made the commonsense observation that the statute contemplates appointment of custodians for profitable corporations which, like distressed companies, can suffer or be threatened with irreparable injury. The court then cata-logued some of the many examples of actual and threatened irreparable injury to the Company:
• Kevin Obarski (Senior Vice President of Sales) called the feud the “biggest business issue” the Company faces, and bemoaned that the “crazy arbitrary stuff’ coming out of it was “the number 1 reason people leave to go to work at competitors.”
• Michael Sank (Vice President of Corporate Development) agreed: “it’s so obviously the biggest problem the company faces.”
• Yu-Kai Ng (Chief Information Officer) identified as a Company goal in the wake of the 2013 Avengers meeting the need to find a way for Shawe and Elting to work together “without negatively impacting everyone else.”
• Mark Hagerty (Chief Technology Officer) testified that the conflict “hurts company morale” and “is detrimental to the company.”
*159 • Robert DeNoia (former Vice President of Human Resources) expressed his frustration with the “pervasive and continuous hostile environment where inappropriate behavior impacts the morale, health and well-being of myself and the staff.”
• Roy Trujillo (Chief Operating Officer), in a letter drafted for submission to a special master appointed in the New York action, attributed the “mass exodus” in Accounting and Finance to “the ongoing disputes and stressful environment created by it.” He further stated that “[ejmployees are resigning and leaving these departments at unprecedented rates,” that “[t]he morale and retention issue will likely spread,” and that “[t]he company’s reputation is taking a beating, internally and externally.”
• Kai Chu (an Accounting employee), attributed the “plummeting” morale and loss of employees in Accounting to the “diametrically opposed” orders that had been received from Shawe and Elting.
• Fiona Asmah (a Finance employee) testified that the disputes and conflicting directives have caused her and others to feel “caught in the middle,” have created an “unhealthy work environment,” and have “affected employee morale.”[10]
Shawe himself acknowledged “the potential for grievously harming” the Company by his continued feuding with Elting.[11] The Court of Chancery also found that major clients who are free to use competitive services have expressed concerns about the dispute, Shawe and Elting have also been unable to agree on acquisitions which generally accounted for between 16.5-20% of the Company’s annual revenue and 8-14% of its annual net profit. The Company has made no acquisitions since 2013. As the Court of Chancery held:
[Although it is true that the Company is and has been a profitable enterprise to date, its governance structure is irretrievably dysfunctional. The Company already has suffered from this dysfunction and, in my view, is threatened with much more grievous harm to its long-term prospects if the dysfunction is not addressed.[12]
When it came to the scope of the custodian’s authority, the Court of Chancery considered three alternatives. First, the court could do nothing and “leave the parties to their own devices.”[13] The court rejected this option because the “management of the Company is one of complete and utter dysfunction that is causing the business to suffer and threatens it with irreparable harm notwithstanding its profitability to date.”[14] The Chancellor “found Elting’s distrust of Shawe to be justified” and “Shawe’s actions have cast a pall on the prospect that a third party would pay a fair price for her shares.”[15] The court thus decided against the “do nothing” option because “equity will not suffer a wrong without a remedy.”[16]
Second, the court considered whether to appoint a custodian to serve as a third director or act in some capacity to break the ties between the two factions. He rejected this option because:
*160 [I]t would enmesh an outsider and, by extension, the Court into matters of internal corporate governance for an extensive period of time. Shawe and Elting are both relatively young. Absent a separation, their tenure as directors and co-CEO’s of the Company could continue for decades. It is not sensible for the Court to exercise essentially perpetual oversight over the internal affairs of the Company.[17]
This left the Court of Chancery with a final option — “appoint a custodian to sell the Company so that Shawe and Elting can be separated and the enterprise can be protected from their dysfunctional relationship.” [18] The court recognized that the remedy was “unusual,” and “should be implemented only as a last resort and with extreme caution.”[19] But after reviewing the statute and case law, the court determined that the Court of Chancery “has appointed custodians to resolve deadlocks involving profitable corporations and authorized them to conduct a sale of the corporation.”[20] Further, the Chancellor held:
Having conducted a six-day trial, decided at least sixteen motions, held numerous lengthy hearings, and considered carefully the documentary evidence and credibility of the witnesses along with the parties’ extensive submissions, the painfully obvious conclusion is that Shawe and Elting need to be separated from each other in the management of the Company for its own good. Their dysfunction must be excised to safeguard the Company.[21]
III.
Shawe’s primary argument on appeal is that the court exceeded its statutory authority when it ordered the custodian to sell a solvent company. Alternatively, Shawe argues that, even if the statutory authority existed to authorize the custodian to sell the Company, the Court of Chancery should have tried other measures to address the deadlock before resorting to a sale of the Company. We find, however, that Shawe failed to raise his statutory argument in the Court of Chancery, and cannot raise it for the first time on appeal. We also find that the Court of Chancery took a measured approach to the dispute, and only ordered the custodian to sell the Company after attempting less intrusive measures, and reasonably concluding other less intrusive measures would not be effective. The court’s decision to appoint a custodian to sell the Company was supported by the facts found after trial, was permitted by the statute, and thus was not an abuse of discretion.[22]
A.
The statute, 8 Del. C. § 226(a), provides that “[t]he Court of Chancery, upon application of any stockholder, may appoint 1 or more persons to be custodians, and, if the corporation is insolvent, to be receivers, of and for any corporation [ ].” As this prefatory language contemplates, *161 custodians are appointed for solvent corporations, and receivers are appointed for insolvent corporations.
There are three pathways to appoint a custodian for a solvent corporation, two of which are relevant to this case. First, a custodian may be appointed when:
(1) At any meeting held for the election of directors the stockholders are so divided that they have failed to elect successors to directors whose terms have expired or would have expired upon qualification of their successors ....[23]
Or, a custodian may also be appointed when:
(2) The business of the corporation is suffering or is threatened with irreparable injury because the directors are so divided respecting the management of the affairs of the corporation that the required vote for action by the board of directors cannot be obtained and the stockholders are unable to terminate this division ....[24]
Shawe does not contest the Court of Chancery’s ruling that a custodian may be appointed under § 226(a)(1) due to the stockholder deadlock between Shawe and Elting, and their inability to elect successor directors. Nor could he. Shawe and Elting stipulated to the stockholder deadlock required by the statute.[25]
Shawe does challenge the Court of Chancery’s appointment of a custodian under § 226(a)(2), claiming that the court misapplied the requirement that the court find irreparable injury to the business of the corporation. According to Shawe, the court improperly relied on case law defining irreparable injury in the temporary injunction context, instead of applying a supposedly more rigorous “imminent corporate paralysis” standard under § 226. Shawe argues that applying the wrong standard “trivializes and undermines Section 226” because judicial intervention is only permitted in “extreme circumstances.” [26]
First, the argument is academic because Shawe agreed that the Court of Chancery was authorized to appoint a custodian under § 226(a)(1). Elting need not show irreparable injury under the first part of the statute.[27] Further, the Court of Chancery did not misapply the threatened or actual irreparable injury requirement. As the court observed, “irreparable injury” is “a familiar equitable principle” which takes into account factors like “harm to a corporation’s reputation, goodwill, customer relationships, and employee morale.”[28] Whether describing the standard as the Chancellor did, or as imminent corporate paralysis, it is a distinction without a difference. This Court in Giuricich v. Emtrol Corp. used the same words interchangeably.[29] The Court of Chancery properly applied the words of the statute and set- *162 tied principles of irreparable injury to evaluate the likelihood of threatened or actual irreparable injury to the Company’s business.
Far from trivializing the irreparable injury requirement, the Court of Chancery accepted the fact that the Company was profitable, but also recognized the extremely dysfunctional relationship between the founders and its effect on all of the Company’s operations. If allowed to persist, the Company was likely to continue on the path of plummeting employee morale, key employee departures, customer uncertainty, damage to the Company’s public reputation and goodwill, and a fundamental inability to grow the Company through acquisitions.
We will not disturb these factual findings on appeal. The trial record amply supports the Court of Chancery’s finding that the deadlock and dysfunction between the founders is causing threatened and actual irreparable injury to the Company.[30]
B.
Having decided that the Court of Chancery properly exercised its discretion under § 226 to appoint a custodian of the Company, we ton to Shawe’s primary argument raised for the first time on appeal — that the custodian statute does not authorize the court to order the custodian to sell the Company over the stockholders’ objection. Shawe also argues that instructing the custodian to sell the Company is an extreme remedy, and should not have been imposed without first attempting less-drastic remedies, such as using the custodian as a third director to break the ongoing deadlocks between the founders.
For the important reasons expressed in Part IV of this Opinion, our Court requires that arguments be considered in the first instance by the trial court before appellate review.[31] We have closely scrutinized Shawe’s record citations where he claims his statutory argument was raised below, and find each of his citations unconvincing or supporting the opposite conclusion.[32] *163 The argument is waived. Even if the argument was properly before us, we find that the arguments relied upon by the' dissent for the first time on appeal lack merit.[33]
Section 226(b) of the statute provides that:
A custodian appointed under this section shall have all the powers and title of a receiver appointed under § 291 of this title, but the authority of the custodian is to continue the business of the corporation, and not to liquidate its affairs and distribute its assets, except when the Court shall otherwise order, and except in cases arising under paragraph (a)(3) of this section or § 352(a)(2) of this title.[34]
Section 394 of the Delaware General Corporation Law (“DGCL”) provides that all corporations agree to make all provisions of the DGCL part of their charters. Under the express language of the custodian statute, the Court of Chancery has the authority to “otherwise order” the custodian to “liquidate [the Company’s] affairs and distribute its assets” rather than “continue the business of the corporation.”[35] In other words, the custodian’s default duty is to continue the business of the corporation, but the Court of Chancery can displace the default duty by ordering that the company’s affairs be liquidated.
Several sources confirm the Court of Chancery’s broad authority under the statute, which includes ordering a sale. As the court noted, the Court of Chancery has previously authorized a custodian to sell a company when faced with stockholder deadlock.[36] This Court has also recognized *164 the broad authority granted the Court of Chancery under the statute. Section 226(b) provides that the custodian shall have “all the powers and title of a receiver appointed under § 291.”[37] Although we have cautioned that normally the custodian’s authority “should be kept to a minimum” and “should be exercised only insofar as the goals of fairness and justice ... require,” we have also observed' that the court’s broad authority to set a receiver’s duties under § 291 leads to the same conclusion for a custodian’s authority under § 226(b):
We interpret this section [226(b)] as setting forth the maximum statutory limits on the powers of the custodian. Section 291, to which § 226(b) specifically refers, states: “the powers of the [receiver] shall be such and shall continue so long as the Court shall deem necessary.” Thus, under §§ 226 and 291, the Court of Chancery may determine the duration of the appointment and the specific powers to be conferred upon the custodian.[38]
The dissent does not take issue with the express language of the statute that the custodian has all of the powers of a receiver under § 291. Nonetheless, it appears to argue that a custodian is not empowered to exercise the powers of a receiver when the court “otherwise orders” that a deadlocked solvent company be sold.[39] According to the dissent, even though the language “except as the Court shall otherwise order” directly modifies the phrase coming before it — “not to liquidate its affairs and distribute its assets” — and is followed by the words “and except” — the dissent argues that interpretive principles should be applied to require that the exception language be read to permit liquidation only in circumstances similar to § 226(a)(3) (corporations that have abandoned them business) and § 352(a)(3) (custodians for close corporations).
The problems with this interpretation of the statute are apparent. The dissent attempts to change the plain meaning of the statutory language by invoking rules of statutory interpretation. But if a statute is clear and unambiguous, “the plain meaning of the statutory language controls.”[40] This is because “[a]n unambiguous statute precludes the need for judicial interpretation.” [41]
Under a plain reading of § 226(b), the custodian has the powers of a receiver under § 291, and his duties are to continue the business unless the Court otherwise orders, and except under the special circumstances of abandoned businesses and close corporations. Rules of interpretation should not be invoked to contort the plain language of a statute in a manner inconsistent with its plain meaning.
Further, the dissent’s interpretation also ignores the conjunctive words “and except.” The statute cannot reasonably be read to express the three exceptions as a series of similar events. Instead, when the words “and except” are given meaning, the statute is reasonably read to list three distinct exceptions to the custodian’s default duty to maintain the business — “except when the Court shall otherwise order;” and “except in cases arising under *165 paragraph (a)(3). of this section;” or “§ 352(a)(2) of this title.”[42]
The dissent also points to § 273, a section of the DGCL permitting dissolution of joint venture corporations when two 50% owner-stockholders are deadlocked. In many instances, that statute has been employed to break a deadlock through a sale of the corporation under the auspices' of the Court of Chancery and a fiduciary appointed by it for that purpose.[43] Contrary to what the dissent contends, it is by no means unprecedented for the Court of Chancery to have to address the fate of a solvent Delaware corporation by setting up a fair process to have it sold as a going concern, when that outcome is necessary to best protect its constituencies.
As the Chancellor observed, this case “was within a whisker” of § 273.[44] The only novelty here is that this case arises under § 226, because the economic and functional reality of the deadlock does not fall precisely under § 273. But, consistent with the flexible and efficient design of the DGCL, § 226 allows the Court of Chancery to address this situation by using its power to deal with cases on a situational basis. Rather than read the key language “except when the Court shall otherwise order” as having no significance, we read it consistently with the overall design of the statute, and its intention to allow our Court of Chancery the discretion to deal sensibly with corporations that are unable to move forward with governance because their owners cannot take fundamental action to elect a new board. That the Chancellor looked for guidance to the remedies entered in cases under § 273 was not error on his part. Instead, it suggests that the court understood TPG’s economic reality as identical to a 50-50 deadlock, and that the tools used to sensibly address those deadlocks would inform his discretion under § 226.
It is also not convincing to characterize the method chosen by the Chancellor as somehow different for purposes of § 226 because it involves a sale of the corporation’s stock, rather than its underlying assets. Stockholders of Delaware corporations are only entitled to the rights that come with their stock, and those rights are subject to the Court of Chancery’s power under statutes like § 226.[45] Many Delaware statutes, including those dealing with certain mergers, subject stockholders to giving up their shares over their objection.
When a stockholder buys stock in a Delaware corporation, it knows that our statute provides the Court of Chancery broad authority to address corporate deadlocks of various kinds, authority that may well affect fundamental ownership interests. Stockholders buy stock in Delaware corporations to gain from the underlying operations of the corporation. It is therefore inconsistent with the practical and efficient design of corporate law in the DGCL, to require asset sales and liquidations, simply *166 to allow stockholders to hold their paper shares and receive a final, and likely lower, liquidating dividend. Nor is it the case that sales of corporate assets or of the entire corporation are somehow unusual when the corporation in managerial deadlock is profitable. The reality is that most of the cases in which the Court of Chancery has ordered a sale or its equivalent in the context of § 273 dealt with profitable corporations.[46] Those are the corporations that parties tend to fight over, especially in the Court of Chancery, because most insolvent corporation cases are handled by federal bankruptcy courts. Parties intractably deadlocked will rarely want what the dissent characterizes as a lesser remedy like asset sales and dissolution.
This case illustrates that reality well. Here, making a distinction between liquidation and sale has no real practical effect. TPG acts as a holding company for the main wholly-owned operating company, TPI, and other subsidiaries. If we accepted Shawe’s interpretation of § 226(b), after remand the Court of Chancery could exalt form over substance and order TPG’s assets — TPI and other subsidiary companies — liquidated through a sale process, and the proceeds distributed to TPG and then its stockholders. Shawe concedes as much.[47] Such meaningless corporate shuffling illustrates why a reasonable reading of the statute includes a custodian’s authority to sell TPG instead of its parts. Neither Elting nor Shawe want an asset sale, and for good reason. Selling TPG as a going concern will protect TPG’s employees from the ruinous consequences of an asset sale and provide the maximum return to the stockholders.[48]
Shawe also faults the Court of Chancery for ordering a sale instead of experimenting with less-intrusive measures. We agree with Shawe that a sale is a remedy to be employed reluctantly and cautiously, after a consideration of other options. The Court of Chancery should always consider less drastic alternatives before authorizing the custodian to sell a solvent company. But the remedy to address the deadlock is ultimately within the Court of Chancery’s discretion.[49] The court did not abuse its discretion in this case.
First, the court attempted other less intrusive measures by appointing a custo *167 dian immediately after trial ended to serve “as a mediator to assist Elting and Shawe in negotiating a resolution of their disputes.” [50] Almost three months later, after the first attempt at mediation failed, the court gave the parties another month before issuing its post-trial opinion “to afford them additional time to seek to resolve their disputes through the auspices of the mediator.”[51] The Court of Chancery was also aware of repeated efforts to resolve the dispute in New York, including settlement discussions, a mediation, and multiple sessions with a court-appointed Special Master. The Court of Chancery gave the parties every opportunity to resolve their acrimonious dispute outside the courthouse.
Further, the court considered whether to appoint a custodian “to serve as a third director or some form of tie-breaking mechanism in the governance of the Company.” [52] But the court rejected this option because:
[I]t would enmesh an outsider, and, by extension, the Court into matters of internal corporate governance for an extensive period of time. Shawe and Elting are both relatively young. Absent a separation, their tenure as directors and co-CEOs of the Company could continue for decades. It is not sensible for the Court to exercise essentially perpetual oversight over the internal affairs of the Company.[53]
And, although Shawe characterizes the Chancellor’s remedy as extremely intrusive, the appointment of a custodian to act as a constant monitor and tiebreaker— which is what would be required given the abundant record that Shawe and Elting cannot work together constructively— would itself be expensive, cumbersome, and very intrusive. Moreover, that approach would not facilitate, as the Chancellor’s ruling does, the ability of the Company to capitalize on its business model in the efficient, flexible way that commerce demands. By preserving the Company as a whole in his remedy and allowing it to be owned and managed in the manner required to take advantage of evolving opportunities and to meet challenges effectively, the Chancellor’s remedy also was well designed to protect the other constituencies of the Company — notably its employees — by positioning the company to succeed and thus to secure the jobs of its workforce.
The Chancellor was in the best position to assess the viability of options short of sale. Aware of the “extreme caution” that must be exercised before ordering a sale, he nonetheless determined that “the painfully obvious conclusion is that Shawe and Elting need to be separated from each other in the management of the Company. Their dysfunction must be excised to safeguard the Company.”[54] We will not second-guess that first-hand judgment on appeal.[55]
*168 IV.
For the first time on appeal, Shirley Shawe raises a novel argument that the Court of Chancery lacked the authority to order TPG’s sale. Specifically, she alleges that the possibility that she would have to sell her share violates the Takings and Due Process Clauses of the United States and Delaware Constitutions. Shirley Shawe admits that she did not properly present this issue before the Court of Chancery.[56]
Under Supreme Gourt Rule 8, this Court only considers questions fairly presented to the trial court.[57] The rule provides a narrow exception “if [this Court] finds that the trial court committed plain error requiring review in the interests of justice.”[58] This standard has been applied in both criminal and civil cases.[59] We have previously refused to review constitutional arguments raised for the first time on appeal.[60]
“When reviewing for plain error, ‘the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process.’ ”[61] “Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest in *169 justice.”[62] As one learned treatise states:
It is axiomatic that an appellate- court will generally not review any issue not raised in the court below. This rule is based on the principle that it is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider. Furthermore, it is unfair to allow a party to choose to remain silent in the trial court in the face of error, taking a chance on a favorable outcome, and subsequently assert error on appeal if the outcome in the trial court is unfavorable.[63]
Opponents should have a fair chance to address arguments at the trial court. It is prudent for the development of the law that appellate courts have the benefits that come with a full record and input from learned trial judges. Thus, fair presentation facilitates the process by which the application of rights in an individual case affects others in other cases and society in general.
Shirley Shawe urges this Court to consider her new argument under the interests of justice exception because the ruling will have significant implications for future cases. But that is exactly why we should not address her argument. The record is largely undeveloped, the trial judge did not have the opportunity to make a thoughtful ruling, and Shirley Shawe’s briefs only cursorily address the issue. Because this Court takes such complex constitutional issues seriously, and because we cannot see how it was plain error for the Court of Chancery to, without prompting from the eleven different law firms representing the Shawes’ interests in this litigation, fail to assess Shirley Shawe’s novel takings argument, we consider the constitutional arguments waived for failure to raise them first in the Court of Chancery.
Finally, Shirley Shawe argues that the Court of Chancery erred when it dismissed with prejudice the derivative claims brought against Elting. Shawe has not appealed the dismissal with prejudice. We agree with the Court of Chancery that Shirley Shawe’s active participation in two of the three “coordinated and functionally consolidated” actions before the Court of Chancery put her on notice that the claims could be dismissed based on Shawe’s unclean hands. The court also found that Shawe functionally represented Shirley Shawe’s ownership interest in the Company. Thus, she is bound by the dismissal with .prejudice of the derivative claims brought by Shawe.
V.
The Court of Chancery’s August 13, 2015 opinion and July 18, 2016 order, and the related orders, are affirmed.

. In re Shawe & Elting LLC, 2015 WL 4874733, at *2 (Del. Ch. Aug. 13, 2015). Elt-ing demonstrated at trial that Shawe held a general proxy for Mrs. Shawe’s one share, and consistendy held himself out as the '50% owner of TPG. Id.

. Id. at *3.

. When Elting ended their engagement, Shawe refused to leave the apartment and crawled under her bed and stayed there for at least half an hour. App, to Opening Br. at 2393 (Trial Tr.). Ón another occasion, Elting was traveling alone in Buenos Aires looking for space to open a new office. She arrived at her hotel room to find that Shawe had showed up unannounced. When she asked him to leave, he crawled under her hotel bed and stayed there for about half an hour. Id.

. In re Shawe & Elting LLC, 2015 WL 4874733, at *27 (internal citations omitted).

. Id. at *6.

. Id. at *23 (internal citations omitted).

.On May 8, 2014, Elting filed an action in New York seeking to remove Shawe as a TPI director. On May 15, 2014, she filed a verified petition for dissolution of Shawe & Elting LLC (Shawe and Elting’s joint owned asset protection and distribution vehicle) in the Court of Chancery. On May 22, 2014, Shawe *158 filed a verified complaint in the Court of Chancery individually and derivatively on behalf of TPG asserting claims against Elting for waste, breach of fiduciary duty, unjust enrichment, breach of contract, and indemnification. On May 23, 2014, Elting filed a petition in the Court of Chancery seeking the appointment of a custodian to sell the Company, and dissolution of TPG under the court’s equitable powers. Id. at *18.

. Id.

. In re Shawe & Elting LLC, 2015 WL 4874733, at *27.

. Id. at *29 (internal citations omitted).

. Id. at *15 (internal citation omitted).

. Id. at *30.

. Id. at *31.

. Id.

. In re Shawe & Elting LLC, 2015 WL 4874733, at *31.

. Id. (quoting Weinberger v. UOP, Inc., 1985 WL 11546, at *9 (Del. Ch. Jan. 30, 1985), aff'd, 497 A.2d 792, 1985 WL 188543 (Del. 1985) (TABLE)).

. Id.

. Id.

. Id.

. Id. (citing Bentas v. Haseotes, 769 A.2d 70, 73 n. 3 (Del. Ch. 2000) and Fulk v. Wash. Serv. Assocs., Inc., 2002 WL 1402273, *2 (Del. Ch. June 21, 2002)).

. In re Shawe & Elting LLC, 2015 WL 4874733, at *31.

. Giuricich v. Emtrol Corp., 449 A.2d 232, 240 (Del. 1982) (applying abuse of discretion standard).

. 8 Del. C. § 226(a)(1).

. Id. § 226(a)(2).

. App. to Opening Br. at 3181-85 (Stipulation and Order).

. Shawe Opening Br. at 29.

. Giuricich, 449 A.2d at 238 (irreparable injury not required before appointing a custodian under § 226(a)(1)).

. In re Shawe & Elting LLC, 2015 WL 4874733, at *28.

. 449 A.2d at 239 n.13 (describing "imminent corporate paralysis” as equivalent to "irreparable harm” when considering whether irreparable harm is required before appointment of custodian under § 226(a)(1)).

. Shawe also raises an unclean hands defense, claiming that Elting’s obstructionist conduct barred the appointment of a custodian. The argument was not fairly presented to the Court of Chancery, and will not be considered for the first time on appeal. Supr. Ct. R. 8 ("Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented.”).

. Supr. Ct. R. 8. To avoid Rule 8, the dissent concludes that Shawe’s statutory argument was fairly encompassed within his general argument made below — that the Court of Chancery should not order a sale under Section 226. Dissent at 170, n.3. But Rule 8 is not satisfied by attempting to anchor serious appellate arguments in the shifting sands of general arguments made below. As the following footnote demonstrates, Shawe not only failed to raise the statutory argument in the Court of Chancery, he took positions inconsistent with the dissent's interpretation of § 226. The Court of Chancery addressed a myriad of issues raised by eleven law firms, including Shawe’s litigation misconduct. The statutory interpretation argument was not one of them. The statutory interpretation argument "credibly can be avoided” because it was never presented to the Court of Chancery, and the Shawes took positions in the Court of Chancery contrary to those offered by the dissent for the first time on appeal. See Dissent at 170, n.3.

. App. to Opening Br. at 3786-91 (Shawe Post-Trial Brief) (Court of Chancery should not appoint a custodian to sell the business because the statute "discourages dissolution” and "Delaware courts refuse to exercise their discretion to dissolve solvent companies where other measures ‘milder’ than dissolution are available.”) (emphasis in original); id. at 3836 (Shawe Answering Post-Trial Brief) ("Elting has not met the very high standard for appointment of a custodian to dissolve and sell the Company under Section 226” and “Dissolution is a last, not first re *163 sort.”); id. at 3850 (Shawe Answering Post-Trial Brief) (“There is no precedent for ordering dissolution because of one failed election of directors.”); id. at 3852-57 (Shawe Answering Post-Trial Brief) (attempting to distinguish case law but no mention of custodian’s lack of authority to sell the Company under § 226(b)); id. at 2382-83 (Shawe Answering Post-Trial Brief) (no argument made that § 226(b) precludes sale of the Company — only arguing that "Elting has provided no grounds” to dissolve the Company); id. at 3916-23 (Post-Trial Oral Argument) (arguing that the custodian’s authority should be "sharply limited” and “rarely, if ever,” appropriate under § 226 but no argument that the statute does not permit a sale, and describing sale as the "ultimate remedy”); id. at 4114-lb (Shawe’s Objections to Sale Report) (Shawe Answering Post-Trial Brief) (challenging custodian’s sale authority under an.improper delegation argument, but not under § 226(b)).

. The dissent chides the majority for responding to the waived statutory interpretation arguments. The dissent has, however, undertaken an exhaustive analysis of § 226, an analysis that we believe is mistaken. Thus, we are obliged to point out why the waived argument has no merit.

. 8 Del. C. § 226(b).

. Id.

. See Bentas, 769 A.2d at 73 n. 3 (ordering appointment of a custodian to resolve deadlock for a "solvent and profitable corporation”). The court authorized the custodian to auction the company in a later decision. Bentas v. Haseotes, 2003 WL 1711856 (Del. Ch. Mar. 31, 2003). See also Bulk, 2002 WL 1402273, at *2, 10 (Court appointed a custodian to sell a corporation that had "consistently been profitable,” and found that "nowhere does the statute require that a sale under Section 273 must take the form of a piecemeal sale of the corporations assets. Although Section 273 permits such a sale, its language is equally consistent with a court-ordered sale of the entire business to a third party as a going concern.”); In re Supreme Oil Co., Inc., 2015 WL 2455952 (Del. Ch. May 22, 2015) (ordering custodian to sell profitable company); Brown v. Rosenberg, 1981 WL 7638, at *5 (Del. Ch. Dec. 17, 1981) (Recognizing “that it is more likely than unlikely that a [cjourt will end up appointing a receiver to liquidate a corporation where there are but two stockholders, both of whom own 50% of the corporation’s shares, when they are unable to agree on anything.”). Although these examples involve actions where the parties eventually agreed the business should be liquidated or sold, they demonstrate the Court of *164 Chancery’s exercise of its broad discretion to fashion an appropriate remedy to resolve a deadlock,

. 8 Del. C. § 226(b),

. Giuricich, 449 A.2d at 240.

. Dissent at 172-73, n.12; 181, n.63.

. LeVan v. Independence Mall, Inc., 940 A.2d 929, 932-33 (Del. 2007) (quoting Eliason v. Englehart, 733 A.2d 944, 946 (Del. 1999)).

. Id.

. 8 Del. C. § 226(b).

. See, e.g., Fulk, 2002 WL 1402273, at *2, 10; Matter of Bermor, Inc., 2015 WL 554861, at *5 (Del. Ch. Feb. 9, 2015) (appointing receiver); In re Bermor, Inc., 2015 WL 7856593 (Del. Ch. Dec. 2, 2015) (ORDER) (order approving receiver’s plan of sale); see also Kortum v. Webasto Sunroofs Inc., 769 A.2d 113 (Del. Ch. 2000) (noting that "if the Section 273 action proceeds to a conclusion, it is possible that ... all of [the company's] outstanding shares will be sold at a public auction.”).

. App. to Opening Br. at 2911 (Trial Tr.) (“It’s interesting, this case is within a whisker of a 273 case where that would not be a very unremarkable request to make. And obviously, the Court has enormous equitable discretion, but it’s practical.”).

. 8 Del. C. § 394.

. The dissent points out that in the cases relied on by Elting, the stockholders did not object to the corporation’s sale. See, e.g., In re Supreme Oil Co., 2015 WL 2455952 (Del. Ch. May 22, 2015) (ORDER); EB Trust v. Info. Mgmt. Servs., Inc., No. 9443 (Del. Ch. June 17, 2014) (ORDER); Fulk, 2002 WL 1402273 (Del. Ch. June 21, 2002); Bentos, 1999 WL 1022112 (Del. Ch. Nov. 5, 1999). But the absence of cases where stockholders object to a company sale is not surprising, when the alternative remedy within the Court of Chancery's discretion is a liquidation of the corporation's assets. As noted above, it would be the rare case when the shareholders would engage in self-defeating behavior by giving up the value of a successful business's goodwill and other intangible assets in favor of a liquidation of its physical assets.

. Shawe Opening Br. at 18-19 ("Section 226(b) ... provides for continuation of the business or liquidation or distribution of the corporation’s assets ...." (emphasis omitted)); see also App. to Opening Br. at 3786-91 (Shawe Pre-Trial Brief) (arguing that, under the facts of this case, the Court "should not dissolve the Company pursuant to its equitable powers.”).

. The dissent has no substantive response to the reality set forth above, except to claim that the point was not conceded by the Shawes and “[n]o party during this appeal has even suggested that either a liquidation or a sale of assets is an option.” Dissent at 172-73, n.12.

. Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 817 A.2d 160, 175 (Del. 2002) ("This Court reviews the Court of Chancery's fashioning of remedies for abuse of discretion.”).

. In re Shawe & Elting LLC, 2015 WL 4874733, at *25.

. Id.

. Id. at *31.

. Id.

. Id.

. Shawe makes two other arguments on appeal, which we find without merit. First, Shawe claims that by ordering a sale, Elting will receive a "control premium” that she could only receive through a contract, such as a buy-sell agreement. The Court of Chancery correctly rejected this argument, reasoning that "the provisions of the Delaware General Corporation Law, including those afforded under section 226, apply by default," and thus the existence of a control premium shared by all the stockholders is irrelevant to the analysis. Id. at *32. Shawe also claims that the court’s privilege rulings were erroneous. We *168 need not evaluate the Court of Chancery's privilege rulings to find that the court properly considered as part of its analysis how Shawe obtained the documents without Elt-ing’s consent. Shawe instructed a surrogate to break into Elting’s office and copy documents from her computer. Privileged or not, ShawS's conduct was reprehensible and confirmed the court’s conclusion that a custodian was necessary to sell the Company instead of some measure short of a sale, doomed to fail.

. Shirley Shawe Opening Br. at 4.

. Supr. Ct. R. 8.

. Smith v. Del. State Univ., 47 A.3d 472, 479 (Del. 2012). This Court has previously used a different standard, which Shirley Shawe characterizes as a three part test: (1) “whether the issue is outcome-determinative and may have significant implications for future cases”; (2) whether the Court's "consideration of the issue will promote judicial economy because it will avoid the necessity of reconsidering the [issue],” (e.g., Sandt v. Del. Solid Waste Auth., 640 A.2d 1030, 1034 (Del. 1994)); and (3) when a question of public policy is involved relating to constitutional guarantees, Rickards v. State, 77 A.2d 199, 202 (Del. 1950). That standard is much less frequently used, especially in our more recent cases, and Shirley Shawe cannot explain why we should prefer it to the more typically applied plain error standard.

. Smith, 47 A.3d at 479 (applying plain error standard in civil case); Sheehan v. Oblates of St. Francis de Sales, 15 A.3d 1247, 1255 (Del. 2011) (same); Estate of Swan v. Balan, 956 A.2d 1222, 1227 (Del. 2008) (same); Beebe Med. Ctr., Inc. v. Bailey, 913 A.2d 543, 555 (Del. 2006) (same); Lagola v. Thomas, 867 A.2d 891, 897 (Del. 2005) (same); Potter v. Blackburn, 850 A.2d 294, 297 (Del. 2004) (same); Duphily v. Del. Elec. Co-op., Inc., 662 A.2d 821, 832 (Del. 1995) (same); Culver v. Bennett, 588 A.2d 1094, 1097 (Del. 1991) (same).

. See Cassidy v. Cassidy, 689 A.2d 1182, 1184-85 (Del. 1997) (stating that interests of justice did not require court to consider whether a statute was unconstitutionally vague or whether the court engaged in unconstitutional delegation of judicial authority). But see Turner v. State, 5 A.3d 612 (Del. 2010) (interests of justice required the Court to review whether the trial judge left the courtroom before the defense finished closing argument because, if true, the trial judge's behavior would have "jeopardized] the fairness and integrity of the trial process.”) (quoting Wainwright, 504 A.2d at 1100)).

. Smith, 47 A.3d at 479 (quoting Wainwright v. State, 504 A.2d 1096, 1100 (Del. 1986)).

. Wainwright; 504 A.2d át 1100.

. 5 Am. Jur. 2d Appellate Review § 618 (2016) (citations omitted)..