**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

IN RE FORUM MOBILE, INC.        )        C.A. No. 2020-0346-JTL

**OPINION**

Date Submitted: December 10, 2021
Date Decided: February 3, 2022

Jeremy D. Anderson, FISH & RICHARDSON P.C., Wilmington, Delaware; *Attorney for Petitioner*

Mark Gentile, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Court-Appointed Amicus Curiae*.

**LASTER, V.C.**

Petitioner Synergy Management Group LLC ("Synergy") seeks to have its president appointed as a custodian for respondent Forum Mobile, Inc. ("Forum" or the "Company"), a defunct Delaware corporation. Synergy relies on Section 226(a)(3) of the Delaware General Corporation Law (the "DGCL"), which provides that "[t]he Court of Chancery, upon application of any stockholder, may appoint 1 or more persons to be custodians . . . of and for any corporation when . . . [t]he corporation has abandoned its business and has failed within a reasonable time to take steps to dissolve, liquidate or distribute its assets." 8 *Del. C.* § 226(a)(3).

The Company's only value lies in the fact that its shares continue to have a CUSIP number that allows them to trade over the counter.[1] Synergy seeks to revive Forum to use as a blank check company. Through a reverse merger with Forum, a new business could access the public markets.

Since 2002, Delaware decisions have enforced a public policy against permitting capital markets entrepreneurs to use sections of the DGCL to revive defunct Delaware entities with still extant listings and use them as vehicles to access the public markets. That policy counseled in favor of denying the application. Mindful that the policy was adopted

---

[1] "CUSIP stands for Committee on Uniform Securities Identification Procedures. A CUSIP number identifies most financial instruments, including: stocks of all registered U.S. and Canadian companies, commercial paper, and U.S. government and municipal bonds. The CUSIP system . . . facilitate[s] the clearance and settlement process of securities. [The] number[] consist[s] of nine characters . . . that uniquely identify a company or issuer and the type of financial instrument." U.S. Sec. & Exch. Comm'n, *CUSIP Number*, http://www.sec.gov/answers/cusip.htm (last visited Feb. 3, 2022).

two decades ago, and dimly aware of potentially intervening developments in the federal securities laws, the court appointed an amicus curiae to consult with the United States Securities and Exchange Commission (the "SEC") regarding the petition and make a recommendation as to whether the court should grant it.

The SEC took no position on the petition. The policy that this court has enforced in prior cases therefore provides no basis for denying the petition in this case.

The court therefore must determine whether to grant the petition. Unfortunately for Synergy, the plain language of Section 226(b) of the DGCL limits the charge of a custodian appointed under Section 226(a)(3) to winding up the affairs of the corporation and terminating its existence. Section 226(b) does not contemplate that a custodian appointed under Section 226(a)(3) could revivify a corporation. Instead, Section 226(b) provides that when a corporation has abandoned its business such that a custodian is required, then the time has come for the corporation's existence to end. This decision therefore denies Synergy's petition.

## I.     FACTUAL BACKGROUND

The facts are drawn from submissions in the case. The facts also take into account publicly available information.

## A.     The Company

The Company was incorporated in Delaware on June 21, 1995. During its existence, the Company has had five distinct entity names and five quite distinct corporate identities.

From June 21, 1995 to June 28, 1999, the Company was named Newmarket Strategic Development Corp. That incarnation of the Company appears to have issued shares to the public in 1995.

In 1999, the Company was the surviving entity in a merger with Reink Corp. After the merger, the Company adopted Reink Corp. as its name. In that incarnation, the Company described itself as "an established manufacturer and marketer of environmentally conscious quality aftermarket ink products for the imaging consumables market."[2]

By early 2004, the Company had "ceased operations and expect[ed] to remain inactive until additional financing which will enable us to restart operations or acquire an existing business is obtained."[3] In March 2004, the Company changed its name to Adsero Corp.

In January 2005, while operating as Adsero Corp., the Company acquired Teckn-O-Laser Inc. and Tecknolaser USA Inc. In that incarnation, the Company engaged in the business of "manufactur[ing] and distribut[ing] remanufactured toner cartridges and inkjet cartridges."[4] In November 2006, the Company was notified that it "was being removed from quotation on the Over-The-Counter Bulletin Board . . . due to [its] failure on three

---

[2] *See* Reink Corp., Registration of Securities of Small business Issuers Under Section 12(b) or 12(G) of the Securities Act of 1934 (Form 10-SB) 3 (Feb. 12, 2001).

[3] Adsero Corp, Annual Report Under Section 13 or 15(D) of the Securities Exchange Act of 1934 (Form 10-KSB) 2 (Apr. 26, 2004).

[4] Adsero Corp, Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-QSB) 8 (May 24, 2006).

separate occasions within a two year period, to make timely filings of [its] quarterly and annual reports."[5]

On May 14, 2008, the Company made its last filing with the SEC, a Form 15 "Certification and Notice of Termination of Registration Under Section 12(g) of the Securities Exchange Act of 1934."[6] That filing indicated that the Company had terminated its public registration under Rule 12g-4(a)(1) for failure to maintain at least 300 stockholders of record. *See* 17 C.F.R. § 240.12g-4(a)(1). That same month, the Company changed its name to Quantum Telecom Inc. Under that moniker, the Company primarily engaged "in the business of computer [and] office equipment."[7]

On September 5, 2012, Quantum Telecom changed its named to Forum Mobile, Inc. In that incarnation, the Company described itself as a "global Mobile Virtual Network Enabler (MVNE) . . . specializ[ing] in MVNE, Mobile Services, Telecom, and cloud services." *Id.* Forum also claimed to be "active in a variety of complimentary fields such as private banking, business development and consulting and provid[ing] hosting and trading platforms." *Id.*

---

[5] Adsero Corp., Current Report (Form 8-K) 2 (Dec. 4. 2006).

[6] Adsero Corp., Certification and Notice of Termination of Registration Under Section 12(g) of the Securities and Exchange Act of 1934 (Form 15) (May 14, 2008).

[7] *FRMB: Forum Mobile Inc.*, SEC Edgar Filing Tracker, https://sec.report/Ticker/FRMB (last visited Feb. 3, 2022).

The Company did not survive long under its latest name. On March 1, 2014, the Delaware Secretary of State declared the Company void for failure to file annual reports or pay annual franchise taxes. Forum currently has a franchise tax balance in arrears of $600,000.

The Company currently has no operating business. Despite its deregistration and cessation of operations, the Company's shares have continued to trade under the stock ticker "FRMB." Before a recent regulation adopted by the SEC, investors could buy and sell the Company's shares through the "Pink Open Market," an interdealer quotation system operated by OTC Markets Group, Inc.

## B.    Synergy

Synergy is engaged in the business of reviving defunct entities with still extant public listings, then making them available to entities that want to access the public markets. According to its website, Synergy seeks "to restore shareholder value for [abandoned and distressed companies] and give private companies access to the ability to go public via reverse merger without a costly IPO."[8]

Synergy owns 494,530 shares of the Company's common stock. Dkt. 1 (the "Petition" or "Pet.") ¶ 7. Synergy seeks an order appointing its president, Benjamin Berry, as a custodian. Synergy states that it intends to revive the Company and call a special stockholder meeting to elect a new board of directors (the "Election Meeting"). Once the

---

[8] Synergy Mgmt., *Home Page*, https://www.synergymgtgroup.com/ (last visited Feb. 3, 2022).

Company has been revived, Berry intends to "identify private companies that may be interested in a reverse merger with" the Company. *Id.* ¶ 30.

Synergy maintains that "[t]he value of the stockholders' equity in the Company will increase if and when a private company brings a new and viable business to [the Company]." *Id.* Doubtless, that is true. In essence, Berry and Synergy plan to use Forum as a blank check company.

Synergy and another entity, Universal Management Association, have filed ten similar petitions in this court. They previously secured custodial appointments for thirteen additional companies incorporated in Colorado, Nevada, and Wyoming. They also previously obtained custodial appointments for three Delaware corporations: Renewal Fuels, Inc., CLST Holdings, Inc., and Critical Solutions, Inc.

The post-appointment history of the three Delaware entities follows the same general pattern. After taking control of the entity as custodian, Berry authorizes the issuance of a single share of super-voting preferred stock that carries 60% of the entity's voting power. He then causes the entity to issue that share to a third party. Alternatively, he issues the share to himself or Synergy, who then sells the share to the third party. In the two sales in which Berry or Synergy sold the super-voting share to a third party, the consideration paid was $25,000.

Berry has attracted a following of investors who appear to purchase shares in the entities that he seeks to revive. Synergy maintains a website where it posts periodic updates on the status of its efforts. A web blog called Investors Hub contains a subpage devoted to the Company on which participants discuss the Company and other "Synergy Plays."

6

## C.    The Filing Of This Litigation

Synergy commenced this action by filing its Petition on May 8, 2020. In its pleading, Synergy contended that the Company had ceased all operations and owed the State of Delaware $600,000 in franchise taxes. Synergy also noted that the Company continued to maintain a listing and a ticker symbol, but also observed that Forum had "failed to provide 'adequate current public information' as defined in Rule 144, promulgated under the Securities Act of 1933, and is thus subject to revocation by the Securities and Exchange Commission pursuant to Section 12(k) of the Exchange Act." Pet. ¶ 6.

Synergy asked the court to enter an order granting the following relief:

(a) Berry be appointed as the custodian of [the Company] for the purpose of paying back fees owed to the State of Delaware and continuing [the Company] as a going concern for the benefit of its stockholders;

(b) Berry be designated as Chairman of the Board of [the Company] for the purpose of calling a Special Meeting of the stockholders of [the Company] to be held subject to the terms and conditions hereinafter specified (the "Meeting"), for the sole purpose of electing from among such persons as might be nominated to stand for election, a board of directors of [the Company], to serve until the next successors of the elected directors might be elected or appointed and qualified;

(c) Berry hold the Meeting at a time and date to be selected by him, which is not a weekend or a legal holiday, and which is more than ten (10) days for [sic] the date on which copies of a notice of the meeting shall be mailed in a manner that is consistent with Delaware statutes, the [C]ompany's bylaws and any orders as the Court might make and enter;

(d) Berry provide notice of the Meeting [to] record owners of the stock certificates and the registered officers and directors of [the Company] specified in its stockholder lists, by mailing such notice to the addresses [of] those stockholders under their respective names and the business records;

(e) Berry verify that the stockholders of record are represented at the stockholder meeting in person or by a valid proxy, which stockholders shall constitute a quorum to conduct an election of directors of [the Company], and who will be entitled to participate in the Meeting and to vote in the election;

(f) Berry, as custodian, report back to this Court after the Meeting to inform the Court of actions taken at the Meeting, including the nomination of directors; and

(g) Berry report back to this [sic] at intervals determined by the Court for as long as the custodianship is maintained or as long as this Court deems necessary.

*Id.* ¶ 29.

After filing the Petition, Synergy attempted to serve it on CSC Global, the Company's last-known registered agent. CSC Global rejected service of process in a letter which stated that "[t]he service of process received for the party served, as listed above, cannot be forwarded to the intended party for one of the reasons listed below." Dkt. 2 Ex. Unhelpfully, the letter identified four alternative reasons, one of which had five subparts, without stating which reason might apply. *Id.*

**D. The Court's Initial Inquiries**

On October 2, 2020, the court held a status conference and asked Synergy to answer four questions:

(a) Why should it be permissible for the Petitioner to be named as custodian for the abandoned company?

(b) How are franchise taxes calculated for the State of Delaware?

(c) How has Synergy yielded value for the historical stockholders of revived companies?

(d) Should normal quorum requirements apply at the stockholder meeting that the custodian planned to call and convene?

8

*See* Dkt. 4.

Synergy filed written responses to the court's questions on October 20, 2020. Dkt. 5. In its responses, Synergy identified an additional individual—Corionne Washington—who would be involved with the custodianship. *Id.* at 4. Synergy also explained that the claimed $600,000 in arrearages to the Delaware Secretary of State was a headline number that assumed the Division of Corporations charged the maximum allowable amount per year based on the authorized shares method. Synergy acknowledged that if Berry was appointed as custodian and sought to bring the Company into compliance, then Berry would seek to use the assumed-par-value method to calculate franchise taxes. The latter method could be expected to result in a significantly lower franchise tax payment. *Id.* at 5.

## E.     The Appointment Of The Amicus

The Petition was not the first time that a capital markets entrepreneur had tried to use provisions in the DGCL to revive a defunct entity with a still extant listing for use as a blank check company. Since 2002, the Court of Chancery has maintained a policy against facilitating the use of defunct entities to access the public markets.[9] In reaching these results, the court recognized and enforced a public policy that sought to channel issuers

---

[9] *See In re Native Am. Energy Gp., Inc.*, 2011 WL 1900142 (Del. Ch. May 19, 2011); *Klamka v. OneSource Techs., Inc.*, 2008 WL 5330541 (Del. Ch. Dec. 15, 2008); *Clabault v. Caribbean Select, Inc.*, 805 A.2d 913, 914–15 (Del. Ch. 2002), *aff'd* 846 A.2d 237 (Del. 2003) (TABLE). The court also invoked this policy in related contexts. *See Williams v. Calypso Wireless, Inc.*, 2012 WL 424880, at *1 n.1 (Del. Ch. Feb. 8, 2012).

towards going public using the formal IPO process. The court consequently declined to exercise its discretion in favor of steps that would enable an issuer to circumvent the formal IPO process. Summing up the position taken in those cases, this court explained that "using a defunct Delaware corporation that happens to retain a public listing to evade the regulatory regime established by the federal securities laws is contrary to Delaware public policy." *Calypso Wireless*, 2012 WL 424880, at *1 n.1.

The policy can be traced to Vice Chancellor Lamb's decision in *Clabault v. Caribbean Select, Inc.* There, Stirling Corporate Services, LLC ("Stirling") sought to revive Caribbean Select, Inc., a defunct corporation, for use as a blank check company. Stirling principally sought to invoke Section 312 of the DGCL, which permits the "revival of [a] certificate of incorporation," but only if "procured as authorized by the board of directors or members of the governing body of the corporation." 8 *Del. C.* § 312(c). Section 312(h) further provides that if the corporation lacks directors who can revive its certificate of incorporation, then "the stockholders may elect a full board of directors, as provided by the bylaws of the corporation, and the board so elected may then authorize the revival." *Id.* § 312(h). The same section provides that "[a] special meeting of the stockholders for the purpose of electing directors may be called by any officer or stockholder upon notice given in accordance with § 222 of this title." *Id.*

Stirling could not use Section 312 because even if it succeeded in calling a meeting, the stockholders in attendance would not be able to "satisfy the normal quorum requirements of Section 222 of the DGCL [or] . . . the provisions of [Caribbean Select's] bylaws." *Clabault*, 805 A.2d at 914. To get around that obstacle, Stirling "petitioned for a

10

court-ordered annual meeting pursuant to Section 211(c), which provides that those shares of stock represented at such meeting 'shall constitute a quorum for the purposes of such meeting.'" *Id.* at 915 (quoting 8 *Del. C.* § 211(c)). That section permits a stockholder or director to file a summary proceeding seeking an order compelling a corporation to hold its annual meeting if (among other circumstances) thirteen months have passed since the last annual meeting. *See* 2 Edward P. Welch, et al., *Folk on the Delaware General Corporation Law* § 211.07, at 7-26 to 7-27 (6th ed. 2014 & 2020-4 Supp.) (citing 8 *Del. C.* § 211(c)).

Vice Chancellor Lamb denied Stirling's petition. He acknowledged that Stirling satisfied the technical requirements for relief under Section 211(c), but he was "unwilling to use [the court's] powers" to aid Stirling's "plan to circumvent important registration and disclosure elements of the federal securities laws" through a reverse merger. *Id.* at 918. He described the petition as part of "a plan to make an 'end run' around the federal rules and regulations governing the public trading of securities," thereby avoiding "the burden or expense of complying with SEC disclosure requirements, in particular the need to file the necessary registration statement." *Id.* at 915. He concluded that "it would be an abuse of discretion to permit Stirling to employ the powers of this court to achieve its questionable ends." *Id.* The Delaware Supreme Court affirmed his decision.

Subsequent cases took the same approach. Most notably, in *Klamka v. OneSource Technologies, Inc.*, Peter Klamka sought the appointment of a custodian under Section 226(a)(3) for OneSource Technologies, Inc., another defunct entity. He thus sought to use the same statutory route that Synergy hopes to follow in this case. Like Synergy, Klamka

11

asserted that "the officers and directors of the corporation have abandoned it and have failed to comply with any statutory corporate obligations for [two years]." 2008 WL 5330541, at *1. Vice Chancellor Noble noted the similarity between Klamka's petition and *Clabault*. Although Klamka sought to use a different statutory vehicle, Vice Chancellor Noble found "instructive" the *Clabault* court's "reluctance to assist in the avoidance of the normal order and process of federal securities regulation." *Id.* As in *Clabault*, the court declined to exercise its discretion to facilitate an effort to "bypass" the "ordinary procedures to establish a business entity . . . . through the revival of the abandoned OneSource absent some demonstrated need or purpose." *Id.* at *2.

In other cases, this court acknowledged the policy articulated in *Clabault. See Calypso Wireless*, 2012 WL 424880, at *1; *Native Am. Energy*, 2011 WL 1900142, at *7. In *Calypso Wireless*, the court entertained a petition to appoint a receiver for Calypso Wireless, Inc. under Section 322 of the DGCL. The record showed that Calypso Wireless had committed "glaring violations of the federal securities laws" and had no "credible plan" to bring itself into compliance. 2012 WL 424880, at *1. Calypso Wireless had originally accessed the public securities market by merging with a defunct but still publicly listed Delaware corporation. The court noted that the use of a defunct entity for that purpose was contrary to Delaware public policy. *Id.* at *1 n.1.

In *Native American Energy*, the petitioner had attempted to use a reverse merger with an otherwise defunct entity to access the public markets, but had committed an error in the process that resulted in the issuance of invalid shares. The court dismissed the action because it "lack[ed] jurisdiction to render what would be an advisory opinion." *Native Am.*

12

*Energy*, 2011 WL 1900142, at *7. In doing so, the court observed that "Delaware has no interest in facilitating reverse mergers with defunct but still publicly registered shell corporations as a means to circumvent the regulatory protections provided by the federal securities laws." *Id.* (citing *Klamka*, 2008 WL 5330541, at *2, and *Clabault*, 805 A.2d at 918).

In its petition, Synergy did not deal forthrightly with these authorities. Synergy cited *Clabault*, but conspicuously omitted any reference to *Klamka*, *Native American Energy*, or *Calypso Wireless*. Omitting *Klamka* was particularly egregious, because that decision addressed the same statutory vehicle that Synergy sought to use. Synergy attempted to distinguish *Clabault,*, but did not do so effectively.

Synergy did, however, point out that the Court of Chancery articulated its policy in 2002, and that much had changed since then. For example, Synergy observed that although the SEC was plainly aware of the risks posed by reverse mergers with blank check companies, the SEC had not prohibited them.

The court knew about the precedents that Synergy had failed to cite. The court also had a general understanding that by the time Synergy filed its petition in this case, the federal government had introduced greater flexibility into the means by which entities could access the public markets. It was therefore unclear whether the *Clabault* policy should apply to this case.

To obtain clarity, the court appointed an amicus curiae. *In re Forum Mobile, Inc.*, 2021 WL 1040978 (Del. Ch. Mar. 18, 2021). The court formally implemented its ruling by order dated April 7, 2021. Dkt. 8. That order charged the amicus "with providing an

13

independent view regarding the merits of the Petition and whether any relief should be granted." *Id.* ¶ 3. The order specified that "[a]s part of this charge, the [a]micus shall consult with [the SEC] regarding the [P]etition." *Id.*

Mark Gentile of Richards, Layton & Finger, P.A., served as amicus. The court expresses its appreciation to the amicus, who acted in the finest tradition of the Delaware bar.

## F.     The SEC Takes No Position.

Consistent with the court's instruction, the amicus requested input from the SEC. On October 29, 2021, the SEC filed a letter brief offering its "views about the effect of the federal securities laws on the [P]etition." Dkt. 13 (the "SEC Letter") at 1. The SEC took "no position on whether the [P]etition should be granted pursuant to Delaware law." *Id.*

The SEC Letter made clear that granting Synergy's requested relief would not enable the Company to circumvent federal securities laws. The SEC noted that "a reverse merger is not *per se* illegal under the federal securities laws." *Id.* at 1, 3. The SEC also observed that "regardless of whether this Court decides to grant the [P]etition, Forum (and Synergy) must follow all federal securities laws and regulations—compliance with Delaware law will not allow Forum or Synergy to circumvent federal law in this context." *Id.* at 3.

In its letter, the SEC identified the federal regulations and regulatory practices that exist to help protect investors from reverse mergers with non-reporting companies. *See id.* at 5–7. The SEC also noted that "[a]s a consequence of their association with fraudulent and manipulative schemes, these types of reverse mergers have prompted Commission

14

action," and "[t]he Commission has pursued numerous enforcement actions against defendants who have engaged in fraud in connection with reverse mergers involving non-reporting issuers, including in response to pump-and-dump schemes and other attempts to manipulate the markets." *Id.* at 2.

The SEC also described regulatory amendments to Exchange Act Rule 15c2-11 that became effective on September 28, 2021. Rule 15c2-11 requires broker-dealers to review issuer information before initiating or resuming quotations for the issuer's securities. The amendments ensure that broker-dealers do not publish quotations for a security when current information about the issuer is not publicly available. The expanded list of information that a broker-dealer must review includes a complete list of insiders and a "current" balance sheet (i.e., one prepared less than sixteen months before the publication of the quotation).

The Company is not a reporting issuer under the Exchange Act and is therefore not required by law to file periodic financial reports or other information regarding its business, management, and ownership with the SEC. Before September 28, 2021, broker-dealers could provide quotations for the Company's shares on the Pink Open Market. Since September 28, 2021, broker-dealers cannot provide quotations unless the Company supplies and the broker-dealers review the information required by the amendments to Rule 15c2-11. Broker-dealers can continue to provide unsolicited quotations on the OTC Markets' Expert Market tier, but those quotations are not publicly available. In addition, OTC Markets has labeled the Company's securities on the Expert Market tier as "Caveat Emptor." That designation signals to investors "that there is a public interest concern

15

associated with the company, which may include a spam campaign, questionable stock promotion, known investigation of fraudulent activity committed by the company or insiders, regulatory suspensions, or disruptive corporate actions."[10]

The SEC did not give any indication that it wanted this court to act as a first line of defense against potential violations of the securities laws by rejecting the Petition.

## G.    The Amicus Recommends Conditional Approval.

As directed, the amicus provided the court with his recommendation regarding the Petition. The amicus acknowledged that "[g]ranting the Petition poses risks to Forum's stockholders arising from their limited access to information" due to Forum's status as a non-reporting issuer. Dkt. 14 at 15. Nevertheless, the amicus recommended that the court grant the Petition and appoint Berry as a custodian subject to "appropriate safeguards." *Id.*

As noted, Synergy and Berry asked the Court to appoint Berry as a custodian so that Berry can call the Election Meeting at which stockholders would elect a new board of directors for the Company. To rectify the present lack of disclosure, the amicus proposed "imposing certain disclosure obligations on the custodian" in advance of the Election Meeting. *Id.* at 17–18. The amicus' proposed disclosures generally would require Berry and Synergy to explain their reasons for pursuing the custodianship, reveal any conflicts of interest, provide contact information, and supply information on the risks of reverse

---

[10]    *Id.* at 3 (quoting *Compliance Flags*, OTC Mkts., https://www.otcmarkets.com/files/OTCM%20Compliance%20Flags.pdf (last visited Feb. 3, 2022)).

mergers. *Id.* at 18–19. The amicus additionally proposes requiring that one of the directors be "independent of Synergy, [] Berry, and prospective third party merger partners." *Id.* at 27. Finally, the amicus would require Berry and Synergy to notify the court if (i) a stockholder filed a Section 220 action demanding Forum's books and records, (ii) a stockholder made a litigation demand on the Forum board of directors; (iii) a stockholder filed a lawsuit alleging breaches of fiduciary duties by any Forum fiduciary, or (iv) Berry, Synergy, or their affiliates or associates, received any investigations, inquiries, subpoenas, or indictments from the SEC or any other government agency in connection with their practice of reviving defunct entities. *Id.* at 19. The amicus provided a proposed order incorporating its recommendations. Dkt. 14, Proposed Order.

The court had not asked the amicus to address whether a custodian appointed under Section 226(a)(3) could be imbued with the authority to revive an entity that had abandoned its business. The amicus did not address that issue, but rather proceeded as if the authority existed. The amicus therefore only analyzed whether the court should exercise its discretion in favor of granting the Petition. Given that this decision concludes that a custodian appointed under Section 226(a)(3) cannot be empowered with the authority to revive an entity that has abandoned its business, this decision provides no opportunity for the court to consider the salutary recommendations of the amicus or to discuss additional conditions that the court might have imposed.

## II.    LEGAL ANALYSIS

Synergy seeks an order appointing Berry as a custodian for Forum under Section 226(a)(3). Synergy's stated purpose for appointing Berry is so that he can "establish an

17

experienced management team that will identify private companies that may be interested in a reverse merger with [Forum]." Pet. ¶ 30. Section 226(b) does not permit a custodian to act for that purpose under the auspices of Section 226(a)(3). Accordingly, the Petition must be denied.

This court has not previously had to address this issue. In *Klamka*, the case where the issue might have arisen, the court denied relief because of the *Clabault* policy. The SEC's decision not to take any position on the Petition provides no basis for applying the *Clabault* policy in this case. The SEC easily could have supported the application of the *Clabault* policy. Instead, the SEC detailed the protections that exist under the federal securities laws, described its vigilance in enforcing those requirements, and took no position on the Petition. The policy articulated in *Clabault* therefore provides no basis for denying relief.

With the *Clabault* policy inapplicable, this court must determine whether Section 226 permits a custodian appointed under Section 226(a)(3) to revive a corporation that has abandoned its business. The plain language of Section 226(b) demonstrates that a custodian appointed under Section 226(a)(3) lacks that authority.

### 1. Principles Of Statutory Interpretation

"The principles of statutory interpretation under Delaware law are clear." *Jud. Watch, Inc. v. Univ. of Del.*, 2021 WL 5816692, at *5 (Del. Dec. 6, 2021). "The goal of statutory construction is to determine and give effect to legislative intent." *Eliason v. Englehart*, 733 A.2d 944, 946 (Del. 1999). "[I]f a statute is clear and unambiguous, 'the plain meaning of the statutory language controls.'" *Shawe v. Elting*, 157 A.3d 152, 164

18

(Del. 2017) (quoting *LeVan v. Indep. Mall, Inc.*, 940 A.2d 929, 932–33 (Del. 2007)). "This is because '[a]n unambiguous statute precludes the need for judicial interpretation.'" *Id.* (quoting *LeVan*, 940 A.2d at 932–33).

A statute is ambiguous "if it is susceptible of two reasonable interpretations." *CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del. 2011). "If [a statute] is ambiguous, '[Delaware courts] consider the statute as a whole, rather than in parts, and [they] read each section in light of all the others to produce a harmonious whole.'" *Doroshow, Pasquale, Krawitz & Bhaya v. Nanticoke Mem'l Hosp., Inc.*, 36 A.3d 336, 343 (Del. 2012) (quoting *Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 538 (Del. 2011)). Delaware courts "also ascribe a purpose to the General Assembly's use of statutory language, construing it against surplusage, if reasonably possible." *Taylor*, 14 A.3d at 538; *see also Giuricich v. Emtrol Corp.*, 449 A.2d 232, 238 (Del. 1982) ("It is fundamental that the Courts ascertain and give effect to the intent of the General Assembly as clearly expressed in the language of a statute.").

### 2.    The Plain Language Of The Statute

The plain language of Section 226 prevents a custodian or receiver appointed under Section 226(a)(3) from reviving a defunct corporation that has abandoned its business. Section 226(a) provides as follows:

> The Court of Chancery, upon application of any stockholder, may appoint 1 or more persons to be custodians, and, if the corporation is insolvent, to be receivers, of and for any corporation when:

> (1) At any meeting held for the election of directors the stockholders are so divided that they have failed to elect successors to directors whose terms

19

have expired or would have expired upon qualification of their successors; or

(2) The business of the corporation is suffering or is threatened with irreparable injury because the directors are so divided respecting the management of the affairs of the corporation that the required vote for action by the board of directors cannot be obtained and the stockholders are unable to terminate this division; or

(3) The corporation has abandoned its business and has failed within a reasonable time to take steps to dissolve, liquidate or distribute its assets.

8 *Del. C.* § 226(a). Section 226(a)(3) thus permits a custodian to be appointed when a corporation "has abandoned its business and has failed within a reasonable time to take steps to dissolve, liquidate or distribute its assets." *Id.* § 226(a)(3).[11]

Satisfying one of the statutory grounds identified in Section 226 does not entitle a petitioner to relief. The plain language of Section 226 makes the appointment of a custodian permissive, giving the court discretion over whether to appoint a custodian. *See, e.g.*, *Giuricich*, 449 A.2d at 239; *Paulman v. Kritzer Radiant Coils, Inc.*, 143 A.2d 272, 273 (Del. Ch. 1958). In *Klamka*, the court relied on its discretionary authority to deny the petition for the appointment of a custodian. 2008 WL 5330541, at *2.

Section 226 does not stop with Section 226(a). In Section 226(b), the statute sets out the powers that a custodian under Section 226 can have. It states:

A custodian appointed under this section shall have all the powers and title of a receiver appointed under § 291 of this title, but the authority of the

---

[11] The statute speaks in terms of either a custodian or a receiver. A custodian is appointed for a solvent entity. A receiver is appointed for an insolvent entity. Synergy seeks the appointment of a custodian, so this decision uses that term. The analysis would apply equally to the appointment of a receiver.

custodian is to continue the business of the corporation and not to liquidate its affairs and distribute its assets, except when the court shall otherwise order and except in cases arising under paragraph (a)(3) of this section or § 352(a)(2) of this title.

8 *Del. C*. § 226(b). The Delaware Supreme Court has interpreted Section 226(b) "as setting forth the maximum statutory limits on the powers of the custodian." *Giuricich*, 449 A.2d at 240.

Section 226(b) first establishes the general rule that "a custodian appointed under this section shall have all the powers and title of a receiver appointed under § 291 of this title, but the authority of the custodian is to continue the business of the corporation and not to liquidate its affairs and distribute its assets." 8 *Del. C.* 226(b). It then provides two exceptions to the general rule that "the authority of the custodian is to continue the business of the corporation and not to liquidate its affairs and distribute its assets." *See id.* The first is "except when the court shall otherwise order." *Id.* The second is "except in cases arising under paragraph (a)(3) of this section or § 352(a)(2) of this title."[12]

The plain language of the second exception thus states that "the authority of the custodian is to continue the business of the corporation and not to liquidate its affairs and distribute its assets . . . except in cases arising under paragraph (a)(3) of this section." *See Id.* § 226(b). The exception creates an alternative scope of authority under which the

---

[12] *Id.* Section 352(a)(2) applies only to close corporations, and it permits the court, "upon application of any stockholder," to appoint a custodian or receiver "of any close corporation when . . . (2) The petitioning stockholder has the right to the dissolution of the corporation under a provision of the certificate of incorporation permitted by § 355 of this title." 8 *Del. C.* § 352(a)(2).

21

custodian does not have authority to continue the business. Instead, the custodian only has authority to liquidate its affairs and distribute its assets.

This is the only reading that gives meaning to the exception. If a custodian appointed under Section 226(a)(3) "had the authority . . . to continue the business of the corporation and not to liquidate its affairs and distribute its assets," then the "except in cases arising under paragraph (a)(3)" clause would be superfluous, a result that is contrary to canons of statutory interpretation. *See Cordero v. Gulfstream Dev. Corp.*, 56 A.3d 1030, 1036 (Del. 2012) ("When construing a statute, we must give effect to the whole statute, and leave no part superfluous." (cleaned up)). The court retains discretion over whether to appoint a custodian and the scope of its powers, but that discretion is cabined by "the clear legislative mandate of the [s]tatute." *See Giuricich*, 449 A.2d at 240.

For a custodian appointed under Section 226(a)(3), therefore, the scope of potential authority is limited to liquidating the affairs of the abandoned corporation and distributing its assets. A leading contemporary treatise interprets the exception in this fashion, noting that "[the exception's] effect would seem to mandate that a custodian appointed pursuant to Section 226(a)(3) will invariably be charged with liquidating the corporation rather than reinvigorating it." Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.10[c][4], at 9-265 (2d. ed. 2018 & 2021 Supp.).[13]

---

[13] The treatise finds the abandoned business limitation "odd . . . when viewed in the context of the statute as a whole" and in light of "the flexible case-by-case approach to custodial powers adopted by the Delaware Supreme Court in *Giuricich.*" *Id.* The statute as

22

Although no Delaware court has held that a custodian appointed under Section 226(a)(3) only has authority to liquidate the business of the corporation, extant precedent points in that direction. In *Shawe v. Elting*, the Delaware Supreme Court interpreted Section 226 consistent with this reading of the statute's plain language. The custodian in *Shawe* was appointed to address a deadlock and empowered "to sell the corporation, with a view toward maintaining the business as a going concern and maximizing value for the stockholders." *In re Shawe & Elting LLC*, 2015 WL 4874733, at *1 (Del. Ch. Aug. 13, 2015), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 152 (Del. 2017). On appeal, Shawe argued that "the custodian statute does not authorize the court to order the custodian to sell the Company over the stockholders' objection." *Shawe*, 157 A.3d at 162. Shawe focused on the language in Section 226(b) which provides that "the authority of the custodian is to continue the business of the corporation and not to liquidate its affairs and distribute its assets." *See* 8 *Del. C.* § 226(b).

The Delaware Supreme Court rejected Shawe's argument because it failed to grapple with Section 226(b)'s "except" clause. The Court explained that "[u]nder a plain

---

a whole distinguishes between an active corporation, where it gives the court broad authority to appoint a custodian to continue the business or take such other action as the court determines, and a corporation that has abandoned its businesses, where the statute only authorizes the custodian to liquidate the corporation's affairs and terminate its existence. The *Giuricich* case dealt with a custodian for an active corporation that was suffering from stockholder deadlock, not a corporation that had abandoned its business. To distinguish between these settings is rational and within the purview of the General Assembly. Of course, if the organs of the bar that oversee the DGCL and the General Assembly wish to alter the scope of authority that a custodian under Section 226(a)(3) can have, they are free to eliminate the abandoned business limitation found in Section 226(b).

23

reading of § 226(b), the custodian has the powers of a receiver under § 291, and his duties are to continue the business unless the Court otherwise orders, *and except under the special circumstances of abandoned businesses* and close corporations." *Id.* at 164 (emphasis added). The Supreme Court stressed "the conjunctive words 'and except,'" explaining that

> [t]he statute cannot reasonably be read to express the three exceptions as a series of similar events. Instead, when the words "and except'" are given meaning, the statute is reasonably read to list three distinct exceptions to the custodian's default duty to maintain the business—"except when the Court shall otherwise order;" and "except in cases arising under paragraph (a)(3) of this section;" or "§ 352(a)(2) of this title."

*Id.* (quoting 8 *Del. C.* § 226(b)).

In *Shawe*, the plain language of Section 226 established that this court properly authorized the custodian to pursue a sale of the company as something the court could "otherwise order." In this case, the distinction between a custodian appointed because of a deadlock under Section 226(a)(1) or 226(a)(2) and a custodian appointed for an abandoned business under Section 226(a)(3) establishes that the latter type of custodian does not have the authority to continue the corporation's business. In "the special circumstances of abandoned businesses," the custodian's duties are limited to liquidating the corporation's affairs and distributing its assets. *See id.*

The few Court of Chancery decisions that invoke Section 226(a)(3) are consistent with the limited authority provided by Section 226(b). For example, in a decision denying an application for the appointment of a custodian under Section 226(a)(3), Chancellor

24

Chandler indicated that the custodian would have limited powers.[14] The court ruled that the entity had not abandoned its business and therefore refused to exercise its "limited statutory authority to order the dissolution of a corporation under 8 *Del. C.* § 226(a)(3) when a corporation has 'abandoned its business' and failed to dissolve, liquidate or distribute assets within a reasonable time." *Id.* at 260; *see id.* at 260–61 (emphasizing that Section 226(a)(3) only grants the court a "narrowly defined statutory authority to dissolve" a corporation). Three other cases invoking Section 226(a)(3) addressed petitions to appoint custodians to liquidate or wind up the company's affairs, not to revive the entity.[15] The

---

[14] *In re Seneca Investments LLC*, 970 A.2d 259 (Del. Ch. 2008). The decision involved a limited liability company, but Section 226(a)(3) applied "because the parties contractually agreed that the LLC would be governed as a corporation and that Delaware General Corporation Law would apply." *Id.* at 260 n.1.

[15] *See Apple Comput., Inc. v. Exponential Tech.*, 1999 WL 39547, at *1 (Del. Ch. Jan. 21, 1999) (describing the plaintiff's litigation goals as including an order appointing a custodian "to wind up [the company's] affairs"); *Rosan v. Chi. Milwaukee Corp.*, 1990 WL 13482, at *5 (Del. Ch. Feb. 6, 1990) ("[Plaintiff] next asks that a custodian be appointed pursuant to 8 *Del. C.* § 226(a)(3) to effectuate a forced liquidation of [the company]."); *Giancarlo v. OG Corp.*, 1989 WL 72022, at *1 (Del. Ch. June 23, 1989) ("The complaint seeks the appointment of a liquidating custodian for [the corporation] . . . ."). Several orders issued by this court are also consistent with the view that a Section 226(a)(3) custodian can only dissolve, liquidate, or distribute an abandoned corporation's assets. *See Wahl v. Centerville Swimming Club, Inc.*, 2021 WL 1549805, at *1 (Del. Ch. Apr. 19, 2021) (ORDER) (appointing a custodian "pursuant to 8 *Del. C.* § 226(a)(3) to wind down, administer claims, and dissolve [the company]"); *Camac Fund, LP v. Surety Hldgs. Co.*, C.A. No. 2019-0541-JTL, Dkt. 19 (Feb. 7, 2020) (ORDER), (appointing receiver under Section 226(a)(3) to "take all actions necessary to wind up the [c]ompany's operations and dissolve the [c]ompany."), *vacated by Camac Fund, LP v. Sur Hldgs. Corp.*, 2020 WL 883465 (Del. Ch. Feb. 21, 2020) (ORDER); *B.E. Cap. Mgmt. Fund LP v. Fund.com Inc.*, 2016 WL 6967899, at *1 (Del. Ch. Nov. 29, 2016) (ORDER) (appointing a receiver under Section 226(a)(3); receiver then began liquidating the company before moving to

only exception is *Klamka*, where the petitioner sought to achieve what Synergy wants in this case. As noted, the court in *Klamka* had no occasion to reach the question of statutory authority because the request conflicted with the policy espoused in *Clabault*.[16]

Under the plain language of Section 226(b), Synergy cannot use a custodian appointed under Section 226(a)(3) to revive Forum's business and use the entity as a blank check company. With Synergy having demonstrated that the Company has abandoned its business and sought the appointment of a custodian under Section 226(a)(3), the plain language of Section 226(b) limits the authority of such a custodian to liquidating the Company's affairs, distributing its assets, and terminating its existence.

## III. CONCLUSION

Synergy filed the Petition to obtain the appointment of a custodian under Section 226(a)(3) for the purpose of reviving Forum for use as a blank check company. Section 226 does not authorize the appointment of a custodian under Section 226(a)(3) to revive an entity that has abandoned its business. Under Section 226(b), "the authority of the custodian is to continue the business of the corporation and not to liquidate its affairs and distribute its assets, . . . except in cases arising under [Section 226(a)(3)]." 8 *Del. C.* §

---

discontinue the liquidation under Section 301 of the DGCL because "cause for liquidation . . . no longer exists," *see id.*, C.A. No. 12843-VCL, Dkt. 74 (Oct. 17, 2018) (ORDER)).

[16] There are three other petitions that Synergy filed in this court and which this court granted. As noted, Synergy did not deal forthrightly with the extant precedent, and the petitions were unopposed. In that setting, "the checks inherent in the adversarial system do not operate." *Forum*, 2021 WL 1040978, at *5. The court therefore gives no weight to those orders, and "the fact that the petitioner obtained [them] is not persuasive." *Id.* at *5.

226(b). Thus, for an abandoned corporation, the "authority of the custodian is . . . to liquidate [the abandoned corporation's] affairs and distribute its assets." *Id.* The Petition is therefore denied.