# COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted: December 22, 2022
Date Decided: December 23, 2022

Daniel A. O'Brien, Esquire
Venable LLP
1201 N. Market Street, Suite 1400
Wilmington, DE 19801

Megan T. Mantzavinos, Esquire
Marks, O'Neill, O'Brien, Doherty
  & Kelly, P.C.
300 Delaware Avenue, Suite 900
Wilmington, DE 19801

RE:   *Bighorn Ventures Nevada, LLC v. Solis et al.*,
      C.A. No. 2022-1116-LWW

Dear Counsel:

I write regarding the plaintiff's Motion for Appointment of a Receiver or Custodian *Pendente Lite* (the "Motion"). Given the purported exigencies involved and the impending holidays, I have endeavored to decide the Motion expeditiously. The record before me makes clear that it is not a close call. The Motion is denied. My reasoning follows.

## I.     BACKGROUND[1]

Nominal defendant MovoCash, Inc. ("MOVO"), a private Delaware corporation headquartered in Palo Alto, California, is a financial technology company. It offers consumers otherwise traditional banking services through MOVO's app and physical debit cards by way of Coastal Community Bank.[2] Defendant Eric Solis, who founded MOVO in 2014, is MOVO's Chief Executive Officer and a member of its Board of Directors.[3]

MOVO's business is reliant on its ability to process transactions.[4] MOVO engages i2c, Inc. as its payment processor and pays i2c certain fees for those services.[5] It also depends on its relationship with Coastal Community Bank to add

---

[1] Evidence submitted by the parties is cited either by reference to the docket or the parties' designation of exhibits presented during the evidentiary hearing on the Motion. The latter is cited by "PX" or "DX" to represent a plaintiff's exhibit or defendants' exhibit, respectively. The transcript of the hearing is cited as "Rough Hr'g Tr. ([Witness Last Name]) __." The final transcript was not available at the time of this decision; quoted text and pagination may change slightly.

[2] Verified S'holder Deriv. Compl. & Pet. for Emergency Relief & a Receiver or Custodian (Dkt. 1) ("Compl.") ¶¶ 17, 29.

[3] *Id.* ¶ 29.

[4] *Id.*; Decl. of Derek B. Distenfield (Dkt. 1) ("First Distenfield Decl.") ¶ 3; *see* Rough Hr'g Tr. (Distenfield) 10-12.

[5] Compl. ¶ 31; First Distenfield Decl. ¶¶ 5-6; *see* Rough Hr'g Tr. (Distenfield) 10-12.

customers and generate revenue.[6]  Coastal Community Bank has required MOVO

to raise additional capital before it can onboard new user accounts.[7]

The plaintiff in this action is Bighorn Ventures Nevada, LLC.  Bighorn is

MOVO's largest Series A investor and shareholder.[8]  Bighorn initially invested in

MOVO because it "believed in the Company's promise."[9]  It now believes,

however, that MOVO's performance is trending downward.  Bighorn alleges,

based on "information and belief," that MOVO is now on "very precarious

financial footing."[10]  It blames Solis for MOVO's troubles and accuses him of

mismanagement and self-dealing.[11]

Bighorn maintains that it has tried (and is trying) to "resolve" the MOVO's

challenges through a "lifeline."[12]  On November 18, 2022, Bighorn offered MOVO

a $300,000 unsecured loan (the "Demand Note") with "favorable, below market

---

[6] Compl. ¶¶ 31-32; First Distenfield Decl. ¶ 8; Rough Hr'g Tr. (Distenfield) 10-12, 20.

[7] Compl. ¶ 38; *see id.* Ex. C.

[8] *Id.* ¶ 1.

[9] *Id.* ¶ 3.

[10] *Id.* ¶ 10.

[11] *Id.* ¶¶ 3-9.  For example, Bighorn accuses Solis of employing family members and invading email accounts.  *Id.* ¶¶ 12-13.  Given that these alleged instances of self-dealing and mismanagement have little bearing on the present Motion, I do not address them in this decision.

[12] *Id.* ¶ 11.

terms that would permit MOVO to pay amounts immediately due."[13]  But its offer came with strings attached, including a "corporate restructuring" condition.[14] Bighorn insisted that: it be permitted to appoint a director to fill the vacant fifth seat on the Board; Solis be removed as CEO and replaced by Derek Distenfield—a Bighorn employee and Board appointee—as interim CEO; and non-party Travis Ault—who had been promised (or at least desired) a Board seat in connection with a large investment—serve only as a non-voting observer to the Board.[15]

At a November 22 Board meeting, Solis and defendant Russell Grant Van Cleve—another Board member—voted against the Demand Note.[16]  They view the Demand Note as an attempted "coup" or "hostile takeover" of MOVO by Bighorn.[17]  Distenfield and Blake Bell—the second Bighorn appointee to the MOVO Board—voted in favor.[18]

On November 25, Solis sent an email to the Board titled "Financial Update."[19]  Solis stated that the Company's accounts payable was "expected to be

---

[13] *Id.*; *see id.* Ex. H.

[14] *Id.* ¶ 14; *see id.* Exs. E, G, H.

[15] *Id.* Ex. H ¶ 7(b); *see also* Rough Hr'g Tr. (Distenfield) 49-50.

[16] *Id.* ¶ 45.

[17] *Id.* ¶ 43; Decl. of Eric Solis (Dkt. 24) ("Solis Decl.") ¶¶ 34-35.

[18] *See* Suppl. Decl. of Derek B. Distenfield (Dkt. 32) ("Suppl. Distenfield Decl.) Ex. G.

[19] Compl. ¶ 46; *id.* Ex. D.

brought down by over $500k by the end of [November]" and that he "believe[d]" he could "close" additional funding over the coming months.[20] Solis explained that he intended to approach MOVO's creditors to reorganize debt while making payments and increasing customer fees.[21]

On December 1, Van Cleve sent the Board an email detailing his concerns with the Demand Note.[22] Van Cleve expressed a desire to properly "exercise his fiduciary duties" and explained that his vote against the Demand Note "in no way signified that [he] support[ed Solis] to the detriment of the company."[23] He questioned whether the Demand Note and its terms "represented a better, more viable, path forward for the company" than retaining Solis and allowing him to seek out "other investments sources (equity or debt), renegotiate debts owed to vendors, and maintain the finesse and skill (and regulatory understanding) needed to keep relations sound with [MOVO's] bank and processor, and to keep the team."[24]

---

[20] *Id.* Ex. D.

[21] *Id.*; PX 21; *see also* PX 14; PX 15; PX 27.

[22] PX 20 ("An assessment of the offer being provided by Bighorn did not provide the needed level of credibility and/or ability to move the needle and thus compel me that it was in the company's best interest.").

[23] *Id.*

[24] *Id.*

Van Cleve recognized that the Demand Note had some "positive features," including "money immediately available" for "some weeks of breathing room."[25] But he described "other elements of the offer that gave cause for pause," including:

- Size of the amount offered. Not enough to move the needle and actually get the company on a new trajectory.

- Timeline of the time when money due (even if easier interest, it's timing of return was shorter than hard money options).

- Change of board control accompanying the injection would mean the company no long[er] had a sense of balance that is so helpful in both good governance and attracting additional investors[.]

- It did not provide any narrative, much less a convincing one, on how the proposed Interim CEO would be able to breed sufficient trust to keep bank and processors and regulatory agencies satisfied, or better yet enthusiastic.

- Proposed Interim CEO [Distenfield] has been serving as [a] Series A director during a time of increased dysfunction[] in the company, including a specific key period in which his demeanor and actions may have contributed meaningfully to catalytic $600,000 of funding not coming.[26]

On the evening of December 1, Bighorn proposed revisions to its offer (the "Revised Demand Note"), purportedly to address Van Cleve's misgivings.[27] The Revised Demand Note: (1) doubled the initial amount of funding (to $600,000) that

---

[25] *Id.*

[26] *Id.*

[27] Compl. ¶ 49; PX 20.

Bighorn had originally offered; (2) extended the maturity date to six months; and (3) made clear that the interim CEO would not be Distenfield.[28] But it would impose the following restructuring conditions on MOVO:

> The Board shall have: (i) removed, or accepted the resignation of, Eric Solis as Chief Executive Officer of the Company [effective prior to December 8]; (ii) approved and appointed, as successor to Eric Solis, an Interim Chief Executive Officer ("Interim CEO") of the Company which the Interim CEO: (A) shall be appointed with the consent of [Bighorn], which consent shall not be unreasonably withheld, (B) shall be independent of any shareholder and/or director or officer of the Company, and (C) shall, subject to the oversight of the Board, have sole authority to manage and oversee all of the Company's businesses, personnel, and finances including but not limited to, negotiating, securing, and approving terms of any form of debt financing and/or issuing new equity, exercising discretion to remove any employee, executive, and/or third-party agent or contractor, and implementing necessary and appropriate cost reduction measures; (iii) appointed a Special Restructuring Committee of the Board acceptable to [Bighorn]; (iv) appointed as a non-voting member Travis Ault as an observer to the Board with rights to attend meetings, receive documents, receive any and all financial information, and make proposals of any kind directly to the Board (subject to all applicable privileges); and (v) authorized and directed the Special Restructuring Committee and the Interim CEO to seek, negotiate and present to the Board for approval one or more definitive

---

[28] Compl. ¶ 50; PX 20.

    written proposals for a corporate and/or financial restructuring of the Borrower . . . .[29]

The Board did not accept the Revised Demand Note.[30]  The vote was, again, two to two.

The next day, on December 2, Bighorn filed this litigation against Solis and Van Cleve.  Bighorn advances breach of fiduciary duty claims against Solis and Van Cleve, a waste claim against Solis, aiding and abetting claims against Van Cleve, and seeks the appointment of a custodian or receiver for MOVO.  Bighorn sought emergency relief and highly expedited proceedings, asserting that the Board was deadlocked and that Solis and Van Cleve "refused to act to protect the Company" because they rejected the Revised Demand Note.[31]

After receiving briefing on Bighorn's motion to expedite and for a temporary restraining order, I heard argument on December 13.[32]  I denied the motion for a temporary restraining order, which asked that I enjoin Solis from "acting as, or holding himself out to be, CEO of MOVO in any manner unless a majority of directors (other than Solis) has approved in writing any and all such

---

[29] PX 20.

[30] Compl. ¶ 50.

[31] *Id.* ¶¶ 54, 64, 69.

[32] *See* Dkt. 35.

actions in advance."[33] That relief would have given the Bighorn directors veto power over all acts taken by Solis. But I granted the motion to expedite, given Bighorn's insistence that MOVO faced certain doom if the court did not intervene.[34]

Specifically, Bighorn argues that MOVO owes a substantial payment to i2c by December 30 and "does not currently have the funds to responsibly make th[is] payment."[35] It suggests that i2c will terminate services if the payment is not made and that a "complete collapse" of MOVO will follow.[36] To prevent this outcome, Bighorn avers that a receiver or custodian must break the Board deadlock so that MOVO can obtain funds through the Revised Demand Note.[37] Accepting those assertions as true, I set an expedited evidentiary hearing on Bighorn's Motion to appoint a receiver or custodian.

The parties subsequently submitted briefs and evidence directed at two questions: whether the Board is deadlocked; and whether MOVO is insolvent. At a hearing held yesterday, December 22, the parties presented additional evidence

---

[33] [Proposed] Order on Pl.'s Mot. for a TRO (Dkt. 1); *see* Dkt. 33.

[34] Dkt. 33.

[35] Pl.'s Reply Mem. in Further Supp. of Mots. for TRO & for Expedited Proceedings (Dkt. 32) 2 (emphasis removed).

[36] *Id.* at 17.

[37] *Id.*

on these issues.  Four witnesses testified live at the hearing.  This is my decision on the Motion.

## II.  LEGAL ANALYSIS

Bighorn contends that the court should appoint a custodian or receiver to break a supposed deadlock on the Board and address insolvency.  It states that such relief is called for under Section 226(a)(2) or Section 291 of the Delaware General Corporation Law.  Barring that, it asks this court to appoint a receiver *pendente lite* pursuant to its equitable authority.

Bighorn is not entitled to the relief it seeks under any of those avenues.

### A.  The Requirements of Section 226(a)(2) Are Not Met.

Section 226(a) provides that the Court of Chancery "may" upon an "application of any stockholder . . . appoint 1 or more persons to be custodians if the corporation is insolvent, to be receivers" for a corporation.[38]  Relevant here, Section 226(a)(2) concerns director deadlock and provides that a custodian may be appointed when:

> The business of the corporation is suffering or is threatened with irreparable injury because the directors are so divided respecting the management of the affairs of the corporation that the required vote for action by the

---

[38] 8 *Del. C.* § 226(a).

board of directors cannot be obtained and the stockholders are unable to terminate this division.[39]

Section 226(a)(2) "sets forth three conditions" that must be met "before this Court may exercise its authority under the statute."[40] First, the board of directors must be "deadlocked" in the sense that they are "so divided respecting the management of the affairs of the corporation that the vote required for curative action by the board as a governing body cannot be obtained."[41] Second, "'the business of the corporation must either be suffering or be threatened with irreparable injury' because of the deadlock."[42] Third, "circumstances must be such that the shareholders are unable by shareholder vote to terminate the division between the directors."[43] Even if the requirements of Section 226(a)(2) are satisfied, the appointment of a custodian "is committed to the Court's discretion."[44]

The Board is allegedly deadlocked 2-2 on the question of whether MOVO is insolvent and if it should accept Bighorn's Revised Demand Note. A deadlock,

---

[39] 8 *Del. C.* § 226(a)(2). *See* Pl.'s Br. in Supp. of its Mot. for Appointment of a Receiver or Custodian Pendente Lite, a TRO, & to Expedite Proceedings (Dkt. 1) ("Opening Br.") 19-20.

[40] *In re Shawe & Elting LLC*, 2015 WL 4874733, at *26 (Del. Ch. Aug. 13, 2015) (citing *Hoban v. Dardanella Elec. Corp.*, 1984 WL 8221, at *1 (Del. Ch. June 12, 1984)), *aff'd*, *Shawe v. Elting*, 157 A.3d 152, 155, 162 (Del. 2017).

[41] *Id.*

[42] *Id.*

[43] *Id.*

however, must "be a product of genuine, good faith divisions" to have legal effect.[45] Here, MOVO's governing documents provide for five Board seats. The appointment of a fifth director would naturally resolve the purported deadlock and obviate any need for judicial intervention.

Article V of MOVO's certificate of incorporation discusses the election of directors and provides that the "holders of Series A Preferred Stock, voting as a separate class" are "entitled to elect two members" of the Board.[46] The "holders of Series Seed Preferred Stock, voting as a separate class" are "entitled to elect one member" of the Board.[47] The "holders of Common Stock, voting as a separate class," are "entitled to elect one member" of the Board.[48] And the "holders of Preferred Stock and the holders of Common Stock, voting together as a combined class," are "entitled to elect one member" of the Board.[49]

---

[44] *Id.* at *31 (citing 8 *Del. C.* § 226).

[45] *Mehra v. Teller*, 2021 WL 300352, at *18 (Del. Ch. Jan. 29, 2021) (citing *Shawe & Elting*, 2015 WL 4874733, at *28).

[46] Defs.' Opp'n to Pl.'s Mot. for the Appointment of a Custodian-Receiver (Dkt. 46) ("Opp'n Br.") Ex. 1 ("Charter") § 5(d).

[47] *Id.*

[48] *Id.*

[49] *Id.*

MOVO's Amended and Restated Voting Agreement provides further detail.[50] The Voting Agreement states, in relevant part, that the "Series A Preferred Designees" are chosen by Bighorn.[51] Distenfield currently holds one such seat with non-party Blake Bell (purportedly) holding the other.[52] The "Series Seed Preferred Designee" is chosen by the "TCA Investors."[53] Van Cleve currently holds that seat. The "Common Designee" is chosen by a "majority-in-interest" of certain "Key Holders" and "shall be" MOVO's CEO (i.e., Solis).[54] Finally, the "Independent Designee"—who must be an individual "not otherwise affiliated with the Company or any Investor"[55]—is to be "chosen by a majority-in-interest of the Key Holders" and "approved by at least two of the Preferred Directors," whose support shall not "be unreasonably withheld."[56] It is that final Independent Designee (or "Additional Director") seat that remains vacant and in dispute.

---

[50] *See* Opp'n. Br. Ex. 2 ("Voting Agreement").

[51] *Id.* § 2.3(a).

[52] *See* Second Distenfield Decl. Ex. G.

[53] Voting Agreement § 2.3(b).

[54] *Id.* § 2.3(c).

[55] The term "Investor" is defined to include certain "prior investors" and "new investors" listed on Exhibit A to the Voting Agreement. *Id.* at Preamble. Exhibit A was not provided to the court.

[56] *Id.* § 2.3(d).

An August 2 unanimous written consent of the Board stated that Ault was appointed to the "vacant board of directors seat reserved for a neutral party" in "correlation with . . . Ault's $500,000 investment in the Convertible Series B Note."[57] As of that date, Distenfield and non-party Diane Link-Morley (spouse of Bighorn's managing member Earl Morley) were the two Series A Preferred Designees. The other two Board members were Van Cleve and Solis.[58]

On August 10, Link-Morley resigned from the Board and non-party Massimo Barrone was designated by Bighorn to replace her.[59] On August 31, Barrone submitted his own resignation. Bighorn then purported to move Ault into the vacant Series A Preferred seat.[60]

By this point, Solis had obtained the commitment of non-party Jason Bell to invest $600,000 in MOVO, subject to his receipt of a Board seat.[61] But Bighorn delayed in approving him. Eventually, on August 31, the Board signed a unanimous written consent designating Jason Bell to serve as the Additional Director "subject to an approval by at least two Preferred Directors and further

---

[57] Defs.' Opp'n. Ex. B; *see* Suppl. Distenfield Decl. ¶ 3; Solis Decl. ¶ 12.

[58] Suppl. Distenfield Decl. ¶ 3.

[59] *Id.* ¶ 4; *id.* Exs. A, B.

[60] *Id.* ¶ 5; *id.* Exs. C, D.

[61] *See* Rough Hr'g Tr. (Solis) at 142-44.

election by stockholders."[62]  That never happened.  Solis testified that Bighorn "sabotaged" Jason Bell's appointment to prevent him from being seated as the fifth director.[63]  MOVO thus lost Jason Bell's potential investment.

On November 17, Bighorn ostensibly removed Ault from his seat as a Series A Preferred director and replaced him with non-party Blake Bell.[64]  Bighorn's counsel informed Ault by letter that he was not on the Board because Bighorn was entitled to remove him under MOVO's Voting Agreement.[65]  A significant portion of the investment Ault had offered was thereby lost.  Bighorn's counsel threatened that if Ault "or anybody else operates as if [Ault] is on the Board, Bighorn will regrettably and immediately need to seek appropriate relief with a proper court in Delaware."[66]

---

[62] Suppl. Distenfield Decl. Ex. E.

[63] *See* Rough Hr'g Tr. (Solis) 144-45; *see also id.* (May) 115.

[64] Suppl. Distenfield Decl. Exs. F, G.  The defendants contest this, pointing to MOVO's bylaws state that a director remains in service "until [a] successor Director is duly elected and qualified, or until that Director's death, resignation, or proper removal."  Defs.' Opp'n. Ex. 3 ("Bylaws") at Art. IV § 17(a).

[65] Defs.' Opp'n. Ex. D.

[66] *Id.*

Separately, Bighorn's counsel told Solis and Van Cleve that if they did not vote to accept the Revised Demand Note, Bighorn would "move for emergency relief and a receivership to resolve the deadlock."[67] And so it did.

Based on my review of the limited record before me, a several conclusions emerge from the fray.

First, Bighorn's effort to move Ault into a Series A Preferred seat and then swiftly remove him is shady.[68] The events occurring after this litigation was filed are equally disquieting. On December 17, Solis tried again to seat Ault on the Board.[69] In doing so, MOVO would have obtained the full amount of Ault's $500,000 investment. But Bighorn refused to entertain Ault's nomination, despite the Voting Agreement's requirement that consent of the Preferred Directors cannot be "unreasonably withheld."[70]

Bighorn insists that Ault is now ineligible to serve as an Additional Director because he is "affiliated with" an "Investor": with Bighorn by virtue of the fact that Bighorn moved him into a Series A Preferred seat (albeit briefly) and with

---

[67] *See* DX 31.

[68] *See* Rough Hr'g Tr. (Distenfield) 50-51.

[69] *Id.* at 37.

[70] Voting Agreement § 2.3(d).

*himself.*[71]  This position appears both baseless and pretextual.  Indeed, Distenfield testified that the "big challenge" Bighorn has with Ault is "not wanting to accept the [D]emand [N]otes."[72]

I therefore suspect that Bighorn took these actions to create a deadlock so that it could (as its counsel threatened) seek judicial intervention.[73]  With Van Cleve expressing thoughtful reasons to reject Bighorn's loan offer and Solis opposed, Bighorn ensured that a third director could not vote against it.  Delaware courts "will not recognize a deadlock if one side sought to manufacture it" or if the alleged deadlock is "based on a specious premise."[74]

Moreover, even if there was a true deadlock, there is no evidence that MOVO's shareholders cannot break it.  This bears on Section 226(a)(2)'s third condition—"the most limiting restriction" of the statute as "a director deadlock case in which curative stockholder action is not possible arises only rarely."[75]  In

---

[71] *See* Pl.'s Reply in Supp. of Mot. to Appoint Receiver (Dkt. 47) ("Pl.'s Receiver Mot. Reply") 7; Rough Hr'g Tr. (Distenfield) 73-74.

[72] Rough Hr'g Tr. (Distenfield) 74-75 ("[W]e felt that that performance was an indication of him not understanding what needed to be done.").

[73] *See* Solis Decl. ¶¶ 16-17.

[74] *Kleinberg v. Cohen*, 2017 WL 568342, at *11 (Del. Ch. Feb. 13, 2017) (citations omitted).

[75] *Id.* at *14 (Del. Ch. Feb. 13, 2017) (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 8.09[c][2], at 8-212 (2012)).

one instance where this circumstance was demonstrated, "stockholders [could] not break the deadlock because of [a voting agreement] and the rights it conferred, locking the two competing factions into a 3-3 impasse."[76]  In another, the parties had stipulated to the fact that the company's stockholders were unable to elect successor directors and there was "no prospect that the stockholders" would "ever" be able to resolve a division between two individuals who "behaved functionally" as if they were 50-50 owners of the company.[77]

Here, Ault did not receive shareholder approval to serve on the Board based on a technicality.  That is, the requisite shareholder vote needed to elect Ault to the Additional Director position was obtained at an improperly noticed meeting.[78] Bighorn's insistence that the result of the improperly noticed meeting is voidable does not, however, mean a properly noticed meeting cannot be held or that the prior vote could not be ratified.[79]  Assuming that an Additional Director (Ault or otherwise) had the support of two of three Preferred Directors, the vote of "holders

---

[76] *Id.* at *14.

[77] *Shawe & Elting*, 2015 WL 4874733, at *30.

[78] *See* Pl.'s Receiver Mot. Reply 5; Bylaws § 6(b) (stating that "[t]he Board of Directors shall determine the time and place of [a] special meeting, which shall be held not less than 35 . . . days after the date of the receipt of the request"); Distenfield Suppl. Decl. Ex. I.

of Preferred Stock and the holders of Common Stock, voting together as a combined class" could presumably be secured.[80]

I therefore decline to appoint a custodian or receiver pursuant to Section 226(a)(2).

## B. Appointment of a Receiver Under Section 291 Is Not Warranted.

Section 291 concerns the appointment of a receiver for insolvent corporations. The provision states that:

> Whenever a corporation shall be insolvent, the Court of Chancery, on the application of any creditor or stockholder thereof, may at any time, appoint 1 or more persons to be receivers of and for the corporation, to take charge of its assets, estate, effects, business and affairs, and to collect the outstanding debts, claims, and property due and belonging to the corporation, with power to prosecute and defend, in the name of the corporation or otherwise, all claims or suits, to appoint an agent or agents under them, and to do all other acts which might be done by the corporation and which may be necessary or proper.[81]

---

[79] Pl.'s Receiver Mot. Reply 6; *see Lofland v. Di Sabatino*, 1991 WL 138505, at *3 (Del. Ch. July 25, 1991) ("[T]he results of [an] improperly noticed [shareholder m]eeting are voidable and not void and are susceptible to cure by ratification.").

[80] Charter Art. V § 5(d). Bighorn has represented that it would attend a properly noticed shareholder vote. *See* Suppl. Distenfield Decl. Ex. J. And Solis testified that the vote could be obtained. *See* Rough Hr'g Tr. (Solis) 135-36.

[81] 8 *Del. C.* § 291.

"The appointment of a receiver 'lies within the sole discretion of the [c]ourt.'"[82] Such an appointment is only appropriate if the company is insolvent and "special circumstances" indicate that "some real beneficial purpose will be served."[83]

A court may conclude that a corporation is insolvent for one of two reasons. The first is when a corporation has "a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof."[84] The second is when a corporation has "an inability to meet maturing obligations as they fall due in the ordinary course of business."[85]

"[I]nsolvency is a jurisdictional fact, proof of which must be clear and convincing and free from doubt."[86] If there is any doubt as to the insolvency of the corporation, a receiver should not be appointed.[87] The record before me, however, is riddled with uncertainty.

---

[82] *Pope Invs. LLC v. Benda Pharm., Inc.*, 2010 WL 5233015, at *6 (Del. Ch. Dec. 15, 2010) (quoting *Banet v. Fonds de Régul. et de Contrôle Café Cacao*, 2009 WL 529207, at *3 (Del. Ch. Feb. 18, 2009)).

[83] *Id.*

[84] *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 782 (Del. Ch. 2004) (quoting *Siple v. S & K Plumbing and Heating, Inc.*, 1982 WL 8789, at *2 (Del. Ch. Apr. 13, 1982)).

[85] *Id.*

[86] *Kenny v. Allerton Corp.*, 151 A. 257 (Del. Ch. 1930).

[87] *See id.*

Regarding MOVO's cash flow solvency, Bighorn points to evidence that MOVO had negative income earlier this year and faces substantial upcoming payments.[88] In addition to a number of ordinary expenses, it owes a total of $1.3 million to i2c.[89] An agreement between MOVO and i2c provides that MOVO will pay i2c $50,000 by December 30, 2022 and another $142,666.14 by January 31, 2023.[90] A series of monthly payments are subsequently owed beginning in February 2023.[91]

At the hearing on the Motion, Bighorn offered the testimony of MOVO's former Finance Manager, who stated that Bighorn had about $2 million in accounts payable (owed to vendors) in addition to outstanding demand notes and convertible notes due in February.[92] Bighorn compared that testimony about MOVO's liabilities to MOVO's monthly revenue which, as of October 2022, was

---

[88] *See* Second Supp. Decl. of Derek B. Distenfield (Dkt. 47) ("Second Supp. Distenfield Decl.") Ex. A.

[89] *Id.* Ex. D ¶¶ 2, 3.

[90] *Id.* Ex. D ¶ 4.1.

[91] *Id.* Ex. D ¶¶ 4.1, 4.2.

[92] Rough Hr'g Tr. (May) 109-11.

$184,938.42.[93]  It was unknown, however, what notes were due when or whether Solis had sought to extend those obligations.[94]

Distenfield, who has been on the Board for six months, also testified.  He stated his understanding that MOVO must raise $900,000 in capital to pay amounts owed to Coastal Community Bank or risk losing that relationship.[95]  Bighorn also educed testimony about another $5 million due to Coastal Community Bank at the end of January.  But the "evidence" offered in support was a blurry screenshot of a portion of a document with no heading, sender, recipient, or date.[96]

Regarding its argument that MOVO's liabilities exceed its assets, Bighorn has also not met its burden of proof.  It relies on a balance sheet dated as of October 31, which is obviously stale.[97]  The other financial data it introduced is likewise current as of October.[98]  Again, its evidence on MOVO's current status was largely limited to testimony from a former MOVO employee and a Bighorn employee who has been on the Board for a short tenure.

---

[93] PX 1.

[94] Rough Hr'g Tr. (May) 113-14.

[95] *Id*. (Distenfield) 12, 21, 24.

[96] PX 4.

[97] Second Supp. Distenfield Decl. Ex. B ¶ 3.

[98] PX 1.

Overall, the bulk of Bighorn's evidence concerns upcoming liabilities, which does not necessarily speak to whether MOVO was insolvent at the time that Bighorn filed its Complaint.[99] In fact, Solis testified credibly that MOVO is current on payroll and taxes and has cash on hand to make the upcoming $50,000 payment to i2c.[100] The latter point is essential, since the December payment to i2c underpinned Bighorn's insistence that MOVO faced imminent harm. Moreover, Solis maintains that MOVO has agreed to terms with i2c for the payment of MOVO's outstanding balance over the next 8 months.[101] Bighorn provided no firm evidence to the contrary.

Solis also states that he has brought in funds to cover operating expenses and debts and has identified investors that may wish to invest in the business.[102] He believes that any outstanding debts can be restructured and payment terms

---

[99] *See In re Geneius Biotechnology, Inc.*, 2017 WL 6209593, at *6 (Del. Ch. Dec. 8, 2017) (considering whether a company was insolvent "at the time of the Petition"); *Manning v. Middle States Oil Corp.*, 137 A. 79, 80 (Del. Ch. 1927) ("Insolvency existing at the time of the suit goes to an essential jurisdictional fact and must be shown.").

[100] *See* Solis Decl. ¶ 39; *see also* Rough Hr'g Tr. 155.

[101] Solis Decl. ¶ 39.

[102] *Id.* ¶ 4. *see* Rough Hr'g Tr. (Solis) 153.

amended.[103]  He explained that MOVO's business provides an ongoing daily influx of revenue and that its shareholders remain willing to provide capital.[104]

Even if MOVO was shown to be insolvent, no special circumstances are present that weigh in favor of appointing a receiver.  Rather, I believe that there are far less severe means available to solve MOVO's problems.[105]  The appointment of Jason Bell, Ault, or another individual to the Board—with an associated investment—would obviously help.  That option was available yet rejected by Bighorn.  It seems that Bighorn believes MOVO's solvency issues must be addressed by Bighorn's preferred means: the Revised Demand Note.

Relatedly, as previously discussed, there are straightforward mechanisms by which to appoint a fifth director and resolve the deadlock (if one exists).  Bighorn nonetheless asks that a receiver be "authorized to and shall act as a Director of [MOVO] so that the current deadlock of the Board can be remedied by, inter alia, action to remove and replace Mr. Solis as CEO and to redress any wrongdoing that is uncovered."[106]  It is, of course, far preferable that the Board—rather than a third party—work to move MOVO's business forward.  This court "should not lightly

---

[103] Rough Hr'g Tr. (Solis) 154.

[104] *Id.* at 155.

[105] *See Pope Invs.*, 2010 WL 5233015, at *8.

[106] [Proposed] Order Appointing Receiver or Custodian *Pendente Lite* (Dkt. 1).

undertake to substitute a receiver for the board of directors of an insolvent company."[107]

Though Bighorn may doubt that the rosy future Solis describes is within reach, it is not Solis's burden to disprove insolvency. "So long as there is a reasonable prospect of success and a corporation is able to respond to the lawful demands of creditors, it should not be pronounced insolvent."[108] As it presently stands and based on the evidence presented, I am not convinced that MOVO "is a hopeless endeavor."[109]

### C. Bighorn's Plea For Equitable Relief Rings Hollow.

Finally, Bighorn asks that the court draw upon its inherent equitable authority to appoint a receiver *pendente lite*. It is well settled, however, that "such power should not be exercised except in a clear case, when it is necessary for the prevention of manifest wrong and injury, and where the plaintiff would otherwise be in danger of suffering irreparable loss."[110] No wrong or injury is "manifest" and the facts—particularly on this limited record—are anything but clear.

---

[107] *Prod. Res. Grp.*, 863 A.2d at 786.

[108] *Sill v. Kentucky Coal & Timber Development Co.*, 87 A. 617, 620 (Del. Ch. 1916).

[109] *Geneius*, 2017 WL 6209593, at *10.

[110] *Beal Bank, SSB v. Lucks*, 1998 WL 778362, at *3 (Del. Ch. Oct. 23, 1998) (quoting *Moore v. Assoc. Producing & Refining Corp.*, 121 A. 655, 656 (Del. Ch. 1923)).

The appointment of a receiver *pendente lite* "ranks as the broadest, most intrusive remedy" provided for by the court's "preventative" powers.[111]  This drastic remedy will not be "resorted to if milder measures will give the plaintiff, whether creditor or shareholder, adequate protection for his rights."[112]  And powers to appoint a receiver are "exercised with great caution and only as exigencies of the case appear by proper proof."[113]

At this early stage—and where Bighorn primarily complains of the Board's refusal to accept its condition-laden Demand Note—it would be highly inappropriate to grant such relief.  I decline to do so.

## III.    CONCLUSION

This court took seriously Bighorn's plea that MOVO faced grave injury absent the immediate appointment of a receiver or custodian.  At Bighorn's insistence, the weighty burdens of expedited litigation were placed upon the defendants and this court.  Yet Bighorn came nowhere close to demonstrating that

---

[111] *Id.*

[112] *Ross Hldg. & Mgmt. Co. v. Advance Realty Grp., LLC*, 2010 WL 3448227, at *6 (Del. Ch. Sept. 2, 2010) (quoting *Maxwell v. Enterprise Wall Paper Mfg. Co.*, 131 F.2d 400, 403 (3d Cir. 1942)).

[113] *Thoroughgood v. Georgetown Water Co.*, 77 A. 720, 723 (Del. Ch. 1910) (explaining that the Court of Chancery will only appoint a receiver *pendente lite* where there is "gross mismanagement, positive misconduct, or other grounds showing a breach of trust on the part of the officers of the corporation, and probably, except in rare cases, only when insolvency has resulted from such misconduct").

the extreme relief sought in the Motion is warranted.  For these reasons, Bighorn's

Motion for Appointment of a Receiver or Custodian *Pendente Lite* is denied.[114]

Sincerely yours,

*/s/ Lori W. Will*

Lori W. Will
Vice Chancellor

---

[114] Bighorn's Motion to Strike Expert Report and Testimony of Jeffrey T. Willoughby, filed early this morning, is also denied.  Willoughby, a CPA, submitted a report and testified on behalf of the defendants.  He stated that, in his view, "there is a reasonable basis to believe the Company has the opportunity to maintain an ongoing operation and survive as a going concern."  Defs.' Opp'n to Pls.' Mot. to Strike Expert Report and Testimony of Jeffrey T. Willoughby at Ex. A.  Bighorn essentially argues that this report should be stricken as irrelevant and unreliable under Delaware Rule of Evidence 702 because it does not speak to the question of MOVO's current solvency.  In my view, that is not a reason to exclude the testimony entirely.  Again, it is MOVO's burden to prove solvency by clear and convincing evidence.  My conclusion that it failed to do so does not turn on Willoughby's report or testimony, to which I have attributed the appropriate weight.  *See Strategic Inv. Opps. LLC v. Lee Enters., Inc.*, 2022 WL 453607, at *12 n.131 (Del. Ch. Feb. 14, 2022) (declining to exclude evidence under Rule 702 but instead giving the evidence "the weight deemed appropriate" by the court).